F I L E D
**United States Court of Appeals**
**Tenth Circuit**

**July 27, 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 04-4111

MARK JAMES GARNER,

Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:03-CR-320-DKW)**

Richard P. Mauro, Salt Lake City, Utah, for the Defendant-Appellant.

Paul M. Warner, United States Attorney, District of Utah, and Kevin L. Sundwall, Assistant United States Attorney, District of Utah, for the Plaintiff-Appellee.

Before **HENRY** , **MCCONNELL,** and **HARTZ** , Circuit Judges. *

**HENRY,** Circuit Judge.

---

* After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* FED. R. APP. P. 34(a)(2); 10TH CIR. R. 34.1(G). The case is therefore ordered submitted without oral argument.

After the district court denied his motion to suppress, Mark James Garner entered a conditional guilty plea to possession of a firearm after conviction of a felony, a violation of 18 U.S.C. § 922(g)(1). In this appeal, he argues that because South Salt Lake City police officers lacked reasonable suspicion to detain him, the district court erred in denying his motion to suppress. We are not persuaded by Mr. Garner's arguments and therefore affirm the district court's decision.

## I. BACKGROUND

Around 5:00 p.m. on April 11, 2003, the South Salt Lake City Police Department received information that a man had been seen in a field near an apartment complex for several hours, unconscious in a half-sitting, half-slumped-over position. Rec. vol. II, at 5 (Tr. of Oct. 23, 2003 Hr'g). Officer Tyrone Boyd proceeded to the apartment complex, arriving at approximately the same time as the municipal fire department. He found Mr. Garner lying in a field on the north side of the complex.

As Officer Boyd approached, Mr. Garner began to walk away. Mr. Garner turned a corner around a building but was stopped by a stone wall. Officer Boyd told Mr. Garner to come back and sit down so that the fire department personnel

could examine him. Mr. Garner complied but, according to Officer Boyd, he appeared nervous, "always looking around [and] saying everything was cool and [that] he didn't want any trouble" and moving his hands in and out of his pockets. Id. at 8.

After fire department personnel examined Mr. Garner, he began to walk away. Officer Boyd told him to sit back down because he was not done with him yet. He then asked Mr. Garner his name and his date of birth, and Mr. Garner provided the information.

About this time, Officer Robert Ransdell arrived. Officer Boyd informed Officer Ransdell that Mr. Garner appeared nervous. Officer Ransdell instructed Officer Boyd to ask the dispatcher to determine whether Mr. Garner had any outstanding warrants.

Officer Ransdell then approached Mr. Garner. Like Officer Boyd, he noticed that Mr. Garner appeared nervous and was moving his hands in and out of his pockets. Officer Ransdell asked Mr. Garner to keep his hands in view and then inquired why Mr. Garner was at the apartment complex and why he was so nervous. Mr. Garner responded that he did not know why he was there and that he had passed out. Officer Ransdell then asked whether Mr. Garner had been taking drugs. Mr. Garner replied that he had "smoked some dope prior that day" and that he had "some warrants." Id. at 44.

-3-

At that point, Officer Boyd informed Officer Ransdell of the results of his background check: Mr. Garner did have some outstanding warrants. Officer Ransdell told Mr. Garner, "you've got some warrants, no big deal," id. at 45, but also indicated that he would be detained until the officers could determine the substance of those warrants. Officer Ransdell directed Mr. Garner to turn around and put his hands behind his back.

At that point, Mr. Garner began to comply but then ran away. The officers, along with fire department personnel, chased and tackled him. Mr. Garner fought with the officers, but they managed to place him in handcuffs. A search of Mr. Garner's pants pockets revealed a handgun and burglary tools.

After the government charged Mr. Garner with possession of a firearm after a felony conviction, a violation of 18 U.S.C. § 922(g)(1), Mr. Garner moved to suppress the evidence found by the officers. In support of his motion to suppress, Mr. Garner first argued that Officer Boyd lacked the necessary reasonable suspicion to support the initial detention. He also argued that, once the fire department completed its examination, the officers lacked reasonable suspicion to continue the detention.

After hearing testimony from Officers Boyd and Ransdell, the district court rejected both arguments. As to the initial detention, the court reasoned that Officer Boyd's observation of Mr. Garner sitting in the field, combined with Mr.

-4-

Garner's nervous and evasive behavior, provided reasonable suspicion to warrant detaining Mr. Garner to investigate a possible public intoxication offense and to determine whether Mr. Garner was suffering from some medical problem. The court further concluded that even after the fire department personnel completed their examination, "Officer Boyd had a continuing and remaining need to assess [Mr. Garner's] condition to determine whether he was under the influence of drugs or alcohol . . . and to assess whether [Mr. Garner] was a danger to himself or others." Rec. vol. I, doc. 21, at 10 (Memorandum Decision and Order Denying Defendant's Motion to Suppress, filed Jan. 8, 2004). Thus, according to the district court, the officers did not violate Mr. Garner's Fourth Amendment rights, and suppression of the evidence discovered in his pockets was not justified.

## II. DISCUSSION

Mr. Garner now argues that Officer Boyd lacked reasonable suspicion to detain him. He notes that the Officer Boyd acted on an anonymous tip and observes that, before allowing police officers to detain a suspect, the courts have usually required some kind of corroboration of the information provided by the tip. As in the district court proceedings, Mr. Garner also argues that Officers Boyd and Ransdell lacked the reasonable suspicion required to continue the detention once fire department personnel finished the physical examination.

When reviewing the district court's denial of a motion to suppress, we view the evidence in the light most favorable to the government and accept the district court's factual findings unless they are clearly erroneous. United States v. Kimoana, 383 F.3d 1215, 1220 (10th Cir. 2004). The ultimate question of reasonableness under the Fourth Amendment is a legal conclusion that we review de novo. Id.

A. The Initial Detention

We begin our inquiry with the initial contact between the police officers and Mr. Garner—Officer Boyd's directing Mr. Garner to come back and sit down so that the fire department personnel could examine him. Although Mr. Garner argues that Officer Boyd then lacked any evidence that a crime had been committed, that argument does not fully describe the role in which Officer Boyd was acting.

This court has recognized that "'[e]ncounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to the desire to prosecute for crime.'" United States v. King, 990 F.2d 1552, 1560 (10th Cir. 1993) (quoting Terry v. Ohio, 392 U.S. 1, 13 (1968)); see also id. (stating that "those aspects of police function that relate to minimizing the likelihood of disorder . . . are equal in their importance to the police function in identifying

and punishing wrongdoers") (quoting 1 ABA STANDARDS FOR CRIMINAL JUSTICE § 1-1.1(c), at 18 (2d ed. 1986)).  The Supreme Court has deemed these responsibilities "community caretaking functions" and has observed that they are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  Cady v. Dombrowski, 413 U.S. 433, 441 (1973).

In some circumstances, a police officer who is exercising these functions may properly detain a person.  King, 990 F.2d at 1561.  For example, in King, we concluded that a police officer's brief detention of a motorist to advise him of hazardous conditions created by an accident and to direct him to stop honking his horn constituted a proper exercise of the community caretaking function "regardless of whether [the defendant's] actions violated any traffic laws."  Id.

Like an investigative detention for law enforcement purposes, such a community caretaking detention must be based upon "'specific and articulable facts which . . . reasonably warrant [an] intrusion' into the individual's liberty." Id. at 1560 (quoting Terry, 392 U.S. at 21).  Additionally, the government's interest must outweigh the individual's interest in being free from arbitrary governmental interference.  Id.  Finally, the detention must last no longer than is necessary to effectuate its purpose, and its scope must be carefully tailored to its underlying justification.  See Florida v. Royer, 460 U.S. 491, 500 (1983).  Once

the officer has completed the inquiry necessary to satisfy the purpose of the initial detention, he or she must allow the person to proceed unless the officer has a reasonable suspicion of criminal conduct. United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir. 1994).

We acknowledge that some statements in our subsequent cases appear inconsistent with the application of the community caretaking doctrine in King. For example, in United States v. Bute, 43 F.3d 531, 535 (10th Cir. 1994), we stated that "the community caretaking exception to the warrant requirement is applicable only in cases involving automobile searches." We agreed with the Seventh Circuit that "the plain import from the language of [ Cady ] is that the Supreme Court did not intend to create a broad exception to the Fourth Amendment warrant requirement to apply whenever the police are acting in an 'investigative,' rather than a 'criminal' function'" and that "[the Supreme] Court intended to confine the holding to the automobile exception and to foreclose an expansive construction of the decision allowing warrantless searches of private homes or businesses." Id. (quoting United States v. Pichany, 687 F.2d 204, 209 (7th Cir. 1982)). Accordingly, we rejected the government's argument that the search of an industrial building based on an officer's suspicion of burglary and vandalism was justified under the community caretaking doctrine.

In several other decisions, we have cited Bute for the proposition that "the community caretaking exception to the warrant requirement is applicable only in cases involving automobile searches." See United States v. Maddox, 388 F.3d 1356, 1366 n.5 (10th Cir. 2004) (rejecting the government's argument that the community caretaking doctrine supported the detention of a defendant who had reached under the seat of a pick-up truck as he pulled up to a residence where officers were serving a search warrant), cert. denied, 125 S. Ct. 1689 (2005); United States v. Thomson, 354 F.3d 1197, 1200 n.1 (10th Cir. 2003) (noting the government's concession that the community caretaking doctrine was inapplicable to a case in which officers had responded to reports of the defendant's threatening remarks to coworkers and had opened a canvas bag after the defendant stated that the bag contained a gun). But see Gallegos v. City of Colorado Springs, 114 F.3d 1024, 1029 n.4 (10th Cir. 1997) (concluding that police officers properly detained a citizen pursuant to the community caretaking function when they observed "a distraught [man] on a public sidewalk in the middle of the night [who] [n]ot only smell[ed] of alcohol, but . . . was crying and walking down the street with his hands over his face").

Nevertheless, for several reasons these statements do not foreclose the officers' exercise of the community caretaking function here. First, Bute involved the search of a building, not, as here, the brief detention of a citizen

reasonably believed by the officers to be at risk to himself. Additionally, in Maddox and Thomson, the police officers were acting in their investigative capacity; there is no indication that in effecting the detentions at issue, they acted for some purpose " wholly unrelated to the desire to prosecute for crime." Terry, 392 U.S. at 13. Moreover, neither Bute nor Maddox nor Thomson cites King, and our application of the community caretaking doctrine in the earlier case thus remains the law of the circuit. See Rogers v. United States, 281 F.3d 1108, 1116 (10th Cir. 2002) (observing that "earlier decisions prevail in the case of an intra-circuit conflict").

Here, upon review of the record, we conclude that Officer Boyd was exercising a community caretaking function when he directed Mr. Garner to return so that the fire department could examine him. Cf. Gallegos, 114 F.3d at 1029 n.4 (concluding that police officers properly detained a citizen pursuant to the community caretaking function when they observed him on a public sidewalk in the middle of the night smelling of alcohol, crying, and holding his hands over his face); United States v. Rideau, 969 F.2d 1572, 1574 (5th Cir. 1992) (en banc) (concluding that officers properly detained a defendant for his own safety and the safety of others after observing him standing in the middle of the road at night, dressed in dark clothes, and apparently intoxicated). Moreover, Officer Boyd's directive was based on "specific and articulable facts . . . reasonably warrant[ing]

-10-

that intrusion." Terry, 392 U.S. at 21.  In particular, Officer Boyd had received a report of "an man down, said to be unconscious in a half sitting, half slumped over position for several hours."  Rec. vol. II, at 5.  When he arrived at the scene, Officer Boyd found Mr. Garner, and he thus had reasonable grounds to conclude that Mr. Garner might be in need of medical assistance.

Officer Boyd also had reasonable suspicion that Mr. Garner may have violated the criminal law.  See Gallegos, 114 F.3d at 1029 n.4 (concluding that police officers' "initial stop . . . was valid under both an investigatory and noninvestigatory rationale").  A Utah statute provides that:

> A person is guilty of intoxication if he is under the influence of alcohol, a controlled substance, or any substance having the property of releasing toxic vapors, to a degree that the person may endanger himself or another, in a public place or in a private place where he unreasonably disturbs other persons.

UTAH CODE ANN. § 76-9-701(1).  The report of an unconscious man in the field outside the apartment complex, combined with Officer Boyd's discovery of Mr. Garner, provided the officer with grounds to briefly detain him to investigate a possible public intoxication offense.

We are not persuaded by Mr. Garner's argument that the anonymity of the person who called the police invalidates the initial detention.  To be sure, as a general rule, when police officers investigate the possible commission of a crime, "something more than an anonymous tip of illegal activity is required to provide

-11-

reasonable suspicion." United States v. Tucker, 305 F.3d 1193, 1201 (10th Cir. 2002); see also Florida v. J.L., 529 U.S. 266, 268 (2000) (holding that "an anonymous tip that a person is carrying a gun," "without more," did not establish reasonable suspicion). That "something more" may be corroboration of information provided by the tip. See id. at 270 (stating that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop'") (quoting Alabama v. White, 496 U.S. 325, 327 (1990)). However, when the only information corroborated is readily available and does not itself indicate that a crime has been committed, reasonable suspicion may be lacking. See United States v. Tuter, 240 F.3d 1292, 1297 (10th Cir. 2001) (noting that "[a]lmost anyone can describe the residents of, and vehicles at, a particular home without having any special knowledge of what goes on inside the home").

Nevertheless, the decisions upon which Mr. Garner relies in challenging the anonymous source are distinguishable. Unlike the anonymous tips in those cases, the tip here did not assert that Mr. Garner was engaging in some hidden criminal activity. See e.g., J.L., 529 U.S. at 272 (describing the issue as whether "the tipster ha[d] knowledge of concealed criminal activity") (emphasis added); cf. 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.5(h), at 571 (4th ed. 2004) (stating that "the central issue [in this line of cases] is whether the informant's

-12-

information is so reliable and complete that it makes past, present, or pending criminal conduct sufficiently likely to justify a stopping of the designated person for investigation"). Thus, when the officers personally observed a man in the field near the apartment complex, they confirmed the key information that they had received from the anonymous source. Because that source had not purported to describe any hidden criminal activities, no further investigation was necessary to adequately corroborate the tip so that Officer Boyd could briefly detain Mr. Garner.

Similarly, the fact that Officer Boyd could not confirm all the information offered by the anonymous source (e.g., how long Mr. Garner had been in the field and whether he had been unconscious) is not dispositive. To establish reasonable suspicion, not every detail of an anonymous tip must be verified. See White, 496 U.S. at 331.

We further conclude that the government's interest in community caretaking outweighed Mr. Garner's interest in being free from arbitrary interference. The anonymous source had reported that Mr. Garner had remained in the field for several hours and appeared unconscious. In light of that observation, Mr. Garner might well have needed medical assistance, and the government had a substantial interest in protecting him. See Rideau, 969 F.2d at 1574 (noting that police officers "have long served the public welfare by

-13-

removing intoxicated people from the public streets, where they pose a hazard to themselves and others"). In contrast, the intrusion upon Mr. Garner's liberty was not extensive. Officer Boyd merely told Mr. Garner to return to the spot from where he had come so that fire department personnel could conduct a brief physical examination.

Accordingly, we conclude that Officer Boyd's initial seizure of Mr. Garner comported with the Fourth Amendment.

## B. The Continuing Detention

Mr. Garner also challenges Officer Boyd's actions after the fire department personnel completed their medical examination. As we have noted, when Mr. Garner attempted to walk away for a second time, Officer Boyd told him to sit back down because the police were not done with him yet. Mr. Garner argues that the officers had no grounds upon which to continue to detain him.

We disagree. As the fire department examined Mr. Garner, Officer Boyd had an opportunity to make further observations. He noted that Mr. Garner appeared "really nervous" and that he was moving his hands in and out of his pockets. Rec. vol. II, at 8. Moreover, even though the fire department concluded the examination and apparently found no emergency medical problems, Officer Boyd had reason to believe that Mr. Garner might still have been intoxicated or

constituted a danger to himself or others and that Mr. Garner may have violated the Utah public intoxication statute. Cf. Illinois v. Wardlow, 528 U.S. 119, 125 (2002) (concluding that even though "the conduct justifying [a] stop was ambiguous and susceptible of an innocent explanation[,]" the officers could "detain the individuals to resolve the ambiguity"); Rideau, 969 F.2d at 1574-75 (concluding that an apparently intoxicated suspect's nervous behavior and backing away from police officers warranted extending the detention).

Moreover, the continuing detention of Mr. Garner was reasonable in scope. Although Mr. Garner maintains that Officer Boyd's request for identification was unduly intrusive, the Supreme Court has held that "[a]n identity request has an immediate relation to the Terry stop's purpose, rationale, and practical demands." See Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt County, 124 S. Ct. 2451, 2459 (2004). Officer Boyd's asking Mr. Garner his name was thus reasonable. In light of the information that Mr. Garner had been sitting and lying in the field for several hours (which suggested that he might be a risk to himself or others and that he might have violated the Utah public intoxication statute), Mr. Garner's continuing nervous behavior, and his moving his hands in and out of his pockets, the subsequent questioning by Officers Boyd and Ransdell was also reasonably related to the purposes of the detention.

## III. CONCLUSION

Accordingly, we AFFIRM the district court's decision denying Mr. Garner's motion to suppress.