932 A.2d 739

**Francis Eugene WILSON, Jr.**

v.

**STATE of Maryland.**

**No. 1566, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Sept. 13, 2007.

8

Marc A. DeSimone, Jr. (Nancy S. Forster, on brief), Balti-more, for appellant.

Abraham Fernando Carpio (J. Joseph Curran, Jr., on brief), Baltimore, for appellee.

Panel KRAUSER, WOODWARD, and WILLIAM W. WENNER, (Retired, Specially Assigned) JJ.

KRAUSER, J.

Francis Eugene Wilson, Jr., appellant, was tried by jury in the Circuit Court for Washington County for disarming a law officer, second degree assault, resisting arrest, possession of marijuana, and disorderly conduct. During the trial, he claimed that his arrest was illegal and moved to suppress "anything that subsequently flowed from" that arrest, including the very testimony presented establishing his guilt of assault, resisting arrest, disorderly conduct, and disarming a police officer. After the circuit court denied the motion, appellant was found guilty of all charges except disarming a law officer.

On appeal, he claims that the circuit court erred in denying his motion to suppress. Because we hold that it did not, we affirm.

## TRIAL

Although appellant filed a motion to suppress before trial, court and counsel agreed that the court would consider appellant's motion during trial. Consistent with that approach, midway through the testimony of the State's first witness, Officer Wayne J. Zimmerer of the Hagerstown Department of Police, the court dismissed the jury, and then, after argument, ruled on appellant's motion to suppress. Our review of the trial testimony considered by the court in denying appellant's request for suppression will therefore focus on Officer Zimmerer's testimony up to the point when the court ruled on the appellant's motion to suppress.

### Suppression Motion Testimony

At trial, Officer Zimmerer testified that on the morning of February 13, 2005, he was in uniform and on routine patrol in

Hagerstown in an unmarked police vehicle. Around 5:00 a.m., he saw "an object laying in the roadway" about two hundred feet from him, "directly in [his] travel lane. . . ." "[A]ssum[ing] it was a trash can or something that had blown out into the middle of the road," he turned on his emergency lights. In response, the object jumped up, revealing for the first time to the officer that what he thought was an "object" was a person. That person, who was identified as appellant, then crossed in front of a van and began to walk away. Leaving his emergency lights on, the officer pulled over to the curb as appellant walked past.

The officer then got out of his vehicle and called to appellant because, as the officer put it, he "wanted to see if he was okay." When appellant did not respond, he "got right beside" appellant, who "appeared to be picking up his pace." The officer could "see [that appellant] had some abrasions on his face and on his knuckles."

Grabbing appellant by his coat sleeve, Officer Zimmerer "told him to have a seat on the curb" and "began talking to him." The officer then "tried to find out his name, ask him what was wrong with him, [and] find out where he lived. . . ." But appellant "just sat there with a blank stare." Even after a few minutes had passed, appellant remained silent and unresponsive.

Although from his "mannerisms," the officer thought appellant was "possibly under the influence of a controlled dangerous substance," he admitted that he did not "know what was wrong with him." He therefore told appellant that he "was going to take him . . . to the hospital" and that "he would have to be handcuffed before he was placed in the cruiser." Handcuffing appellant, the officer testified, was in accordance with departmental policy and not pursuant to an arrest. But when the officer "put [appellant's] right hand behind his back" to place the handcuffs on him, appellant "began to struggle."

At this point, the court dismissed the jury and heard argument on the motion to suppress. The court denied that motion, stating that appellant was properly seized under the

police's "community caretaking function." The court explained that, because appellant was laying in the middle of the road and appeared injured, the officer had reason to suspect that he "was having an injury, an illness, or a medical condition, or was so under the influence that he was potentially going to injure himself or others in the future." [1]

## Post–Suppression Motion Testimony

After the court's ruling, the jury was called back into the courtroom, and Officer Zimmerer resumed testifying. He recalled how, when he put appellant's right hand behind his back to handcuff him and reached for the handcuffs, appellant "went over onto his left side" and starting "kicking his legs out like he was getting ready to ... either get to his feet or to run." Kneeling on the sidewalk, the officer tried to hold him down but appellant continued to flail about. The officer then took out his "pepper spray" and explained to appellant that he was going to spray him if he did not put his hands behind his back. When appellant continued to resist all efforts to place him in handcuffs, Officer Zimmerer "directed a one second spray to his face." The spray "had no effect": Appellant continued to swing at the officer and curse him. When the officer tried to spray him again, appellant grabbed the can and tore off the top rendering it inoperable. Appellant thereafter bit the officer on the elbow and approximately four times on the forearm and kicked the officer "in the inside of the legs and in the groin."

After other officers arrived, one of them fired a Taser stun gun at appellant. A Taser gun stun causes muscles to "go tight" for about five seconds, the officer explained, so that

---

1. The court ruled, in the alternative, that the officer made a *Terry* stop of appellant, saying that, based on appellant's behavior, lying, as he was, in the street, with abrasions on his hands and face and his general non-responsiveness to the officer, "the Officer had articulable suspicion that perhaps a crime had been committed [or] was being committed...." But because the State does not argue in its brief that this was a *Terry* stop and because we find that the detention was reasonable under the community caretaking function, we will not address this issue.

police can "move in and handcuff" an individual. This procedure, the officer asserted, was "normal policy." Ultimately, Officer Zimmerer was able to handcuff appellant and, at this point, appellant was under arrest, the officer testified, for "assaulting [him] and the act of resistance."

Because appellant was bleeding from a head injury he sustained in the struggle, because the hospital was only two blocks away, and because appellant was still trying to kick the officers though handcuffed, the officers decided to put him in a police cruiser and take him to the emergency room themselves rather than wait for an ambulance. After placing the handcuffed appellant into a police cruiser, the officers drove him to Washington County Hospital. At the hospital, appellant continued to fight with the officers as well as guards and hospital personnel until he was finally restrained with leather straps.

After appellant was seen at the hospital, he was taken to the Hagerstown City Police booking area where, according to Officer Jason Batistig, he tried to discard a "clear plastic baggie" containing marijuana, in the bathroom.

Following the testimony of several other witnesses, appellant took the stand. He testified that he suffered from seizures and that, in fact, he had experienced a seizure the night before his early morning arrest. After the seizure, according to appellant, he slept until 2:30 a.m. and, at about 4:30 a.m., decided to get a cup of coffee. The next thing he remembered was being at Washington County Hospital. Admitting that the marijuana belonged to him, he explained that someone had given it to him and that he had been carrying it for about five days.

At the conclusion of the trial, appellant was found guilty of second degree assault, resisting arrest, possession of marijuana, and disorderly conduct. He was sentenced to a term of three years' imprisonment for resisting arrest; a consecutive term of one year imprisonment for possession of marijuana; and a concurrent term of sixty days for disorderly conduct.

## STANDARD OF REVIEW

■ As we previously noted, there was no separate suppression hearing in this case; the court heard the motion during trial. We therefore consider only the evidence before the court at the time of its ruling on the motion to suppress, *Sellman v. State*, 152 Md.App. 1, 7–8, 828 A.2d 803 (2003), and that evidence we review in the light most favorable to the prevailing party, in this instance, the State. *Conboy v. State*, 155 Md.App. 353, 361, 843 A.2d 216 (2004) (citations omitted).

But the circuit court's legal conclusions are subject to *de novo* review by this Court. *Dixon v. State*, 133 Md.App. 654, 668, 758 A.2d 1063 (2000) (citations omitted). Therefore, we must " 'make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case.' " *Id.* (*quoting Reynolds v. State*, 130 Md.App. 304, 313, 746 A.2d 422 (1999)).

## DISCUSSION

Contending that the circuit court erred in denying his motion to suppress, appellant argues that Officer Zimmerer did not detain him in accordance with his caretaking function, but instead arrested him, and, because that arrest was without probable cause, its fruits should be suppressed. Those fruits include, he claims, not only the marijuana, but also his "direct response to [the] unlawful arrest," namely, "the evidence that he resisted Officer Zimmerer's attempts to handcuff him," and therefore his "convictions for resisting arrest, second degree assault, and disturbing the peace should ... be reversed."

Appellant was properly detained by police pursuant to their community caretaking function. "In essence police officers function in one of two roles: (1) apprehension of criminals (investigative function); and (2) protecting the public and rescuing those in distress (caretaking function)." *Stanberry v. State*, 343 Md. 720, 743, 684 A.2d 823 (1996).

■ The latter of the two roles—the caretaking function—permits searches of private property by police that

would otherwise violate the Fourth Amendment where the police have initiated the search, not to investigate crime, but to "aid persons in apparent need of assistance" or to protect property. *State v. Alexander*, 124 Md.App. 258, 269, 721 A.2d 275 (1998) (Alerted to a possible break-in, police entered a house in accordance with their community caretaking function, and thus the marijuana they found was held not suppressible). But the "single most important purpose behind the community caretaking function is to protect citizens from likely physical harm." *State v. Brooks*, 148 Md.App. 374, 385, 812 A.2d 342 (2002) (Upon receiving a domestic violence "911" call, the officer could have entered the private home without a warrant, pursuant to the community caretaking function, if, when he arrived at the location, "no on e was about an d no on e responded to his knock at the door. . . . ").

■ Although our appellate courts have not directly addressed the issue of whether the caretaking function extends beyond searches to seizures of persons as well, there is no basis, rooted in logic or policy, for drawing a distinction between searches and seizures for purposes of the community caretaking function. In fact, the same policy that underlies the community caretaking searches—protecting citizens from likely physical harm—justifies seizures of individuals for that same purpose. Although the United States Supreme Court has not applied the community caretaking function to seizures, lower federal courts have. *See, e.g. United States v. Garner*, 416 F.3d 1208 (10th Cir.2005) (holding that detaining an intoxicated man "slumped over" in a field was proper under the police's community caretaking function); *United States v. King*, 990 F.2d 1552 (10th Cir.1993) (concluding that an officer's initial detention of a motorist at an accident site to advise him of hazardous conditions and to ask him to stop honking his horn was proper pursuant to the community caretaking function); *United States v. Rideau*, 949 F.2d 718 (5th Cir. 1991), *rev'd en banc on other grounds*, 969 F.2d 1572 (5th Cir.1992) (observing that officers' "stop" of a man wearing dark clothing and standing and stumbling in a road at night was proper under the caretaking function; in fact, the officers

"would have been derelict in their duties had they not stopped [him] to check on his condition").[2]

*United States v. Garner*, 416 F.3d 1208 (10th Cir.2005) is particularly instructive on this point as it is factually similar to the case at bar and provides a useful three-prong test for determining whether such detention falls within this function. In *Garner*, police were informed that a man was unconscious in a "half-sitting, half-slumped-over position" in a field near an apartment complex for several hours. *Garner*, 416 F.3d at 1211. When the officer arrived at the field, he found Garner in precisely that position in a field. *Id.* As the officer approached, Garner got up and began to walk away but stopped when he encountered a wall blocking his path. *Id.* The officer told him to sit down so that the fire department personnel, who had just arrived, could examine him. *Id.* Garner complied but "appeared nervous," was "looking around," saying that "he didn't want any trouble," and "moving his hands in and out of his pockets." *Id.*

After being examined by the fire department personnel, Garner started to walk away again, but he sat back down at the officer's request. *Id.* The officer asked him his name and

---

2. The community caretaking function has also been recognized by federal courts in civil cases. *See Winters v. Adams*, 254 F.3d 758 (8th Cir.2001) (holding that officers, accused of conducting unreasonable seizure and use of excessive force, acted lawfully pursuant to the community caretaking function in detaining a driver who was in an "agitated" and "extremely hyper" state and who appeared to be intoxicated, to ensure that "he would not be able to drive and hurt someone"); *Samuelson v. City of New Ulm*, 455 F.3d 871 (8th Cir.2006) (upholding grant of summary judgment in favor of police officers, accused in part of unreasonable seizure for transporting a private citizen to the hospital where, under the community caretaking function, "a jury could not find the officers' actions objectively unreasonable," given that the citizen was incoherent and appeared to be hallucinating); *Tinius v. Carroll County Sheriff Dept.*, 321 F.Supp.2d 1064 (N.D.Iowa 2004) (granting summary judgment in favor of police officers accused of unlawful detention for detaining a private citizen and transporting him to a hospital, as well as assisting in his involuntary catheterization because, under the community caretaking function, the officers' conduct was reasonable since the citizen was walking along a roadway in rural Iowa in winter without a jacket, not carrying identification, and was incapable of carrying on a conversation with an officer).

date of birth, which Garner provided. *Id.* Another officer then arrived and asked Garner why he was at the apartment complex, why he "was so nervous," and whether he had been taking drugs. *Id.* Garner replied that he did not know why he was there, that he had "smoked some dope prior that day," and that he had "some warrants." *Id.* After confirming that he did, in fact, have "outstanding warrants" the officer directed Garner to put his hands behind his back. *Id.* When Garner attempted to flee, the officers tackled him. *Id.* A struggle ensued, but Garner was eventually handcuffed. *Id.* A search of his pants pockets uncovered burglary tools and a handgun. *Id.*

Charged with a handgun violation, Garner moved to suppress the evidence found by the officers, arguing that the police lacked reasonable suspicion to support his initial detention before the fire department personnel examined him and that, after they completed their examination, the police lacked reasonable suspicion to continue his detention. *Id.* The district court denied the motion, finding that Garner's behavior "provided reasonable suspicion to warrant detaining [him] to investigate a possible public intoxication offense and to determine whether [he] was suffering from some medical problem." *Id.* at 1212.

The United States Court of Appeals for the Tenth Circuit agreed, concluding that Garner was initially detained by police pursuant to their community caretaking function and that his continuing detention was reasonable in scope. *Id.* at 1214–16. In reaching this conclusion, the federal appellate court articulated a three-pronged test for determining whether a detention by police was pursuant to their community caretaking function. *Id.* at 1213. That test provided that to qualify as an exercise of the community caretaking function, a detention must be: (1) "based upon 'specific and articulable facts which . . . reasonably warrant [an] intrusion' into the individual's liberty;" (2) "the government's interest must outweigh the individual's interest in being free from arbitrary governmental interference;" and (3) "the detention must last no longer than is necessary to effectuate its purpose, and its scope must be

carefully tailored to its underlying justification." *Id.* (citations omitted).

Applying the first prong—whether the detention was "based upon 'specific and articulable facts which ... reasonably warrant [an] intrusion' into the individual's liberty," *id.*,—the Tenth Circuit found that the receipt of a report by police that Garner w as lying in a field, half slumped over, for several hours, and that he was thereafter found by a police officer in that position when an officer arrived on the scene, constituted "specific and articulable facts" that gave the officer "reasonable grounds to conclude that ... Garner might be in need of medical assistance" and to briefly detain him. *Id.* at 1214.

Applying the second prong—whether "the government's interest ... outweigh[s] the individual's interest in being free from arbitrary governmental interference"—and the third prong—whether "the detention ... last[ed] no longer than [was] necessary to effectuate its purpose, and [whether] its scope [was] carefully tailored to its underlying justification," *id.* at 1213, the federal appellate court found that, because the officer received a report that Garner was "in the field for several hours and appeared unconscious" and therefore "might well have needed medical assistance," the government had a "substantial interest in protecting him." *Id.* at 1215. The court further found that "the intrusion upon ... Garner's liberty was not extensive," because the officer merely told him to return to the spot where he had been sitting so that the fire department personnel could examine him. *Id.* Finally, the Tenth Circuit noted that, as the fire department personnel examined Garner, the officer observed that Garner was "really nervous," and was "moving his hands in and out of his pockets," and therefore the officer had "reason to believe that ... Garner might still have been intoxicated or constituted a danger to himself or others...." *Id.* at 1216. This behavior, the court concluded, warranted extending the detention. *Id.*

■ Appellant's detention satisfies *Garner*'s three-pronged test. His detention was "based upon 'specific and articulable facts which ... reasonably warrant[ed] [an] intrusion' into

[appellant's] liberty." *See id.* at 1213. In fact, the intrusion by police in the instant case was even more warranted than it was in *Garner*. Unlike Garner who was seen lying in an open field and was thus, at worst, only a danger to himself, appellant was observed lying in the middle of a public street at 5:00 a.m., an unquestionably more hazardous location both for him and for unwary drivers traveling on that road at that hour. Moreover, when the officer called out to see if appellant was okay, appellant did not respond. Because appellant did not or could not respond to Officer Zimmerer's calls, the officer grabbed his coat sleeve and sat him on the curb, and proceeded to ask him questions. The officer observed abrasions on his face and knuckles, while appellant stared blankly ahead and failed to respond to the officer's simple and direct queries. Thus, the officer had " 'specific and articulable facts which . . . reasonably warrant[ed] [an] intrusion' into [appellant's] liberty." *See id.*

The second prong is also satisfied because "the government's interest" in the instant case "outweigh[ed] [appellant's] interest in being free from arbitrary governmental interference." *See id.* Lying in the middle of a public street at 5:00 a.m. was a clear indication he needed assistance, medical or otherwise, not to mention the danger his behavior posed to those driving on the road at that time. The government's interest in protecting both appellant and the public clearly outweighed his interest in being free from arbitrary governmental interference.

Appellant suggests, however, that "[w]hatever concerns for appellant's safety" Zimmerer had when he found appellant lying in the street should have been "dispelled when . . . appellant got up on his own accord, and began to walk away in a normal manner." But that act did little to relieve the officer's concern for appellant's safety and that concern was immediately compounded by appellant's failure to respond to the officer's calls and then the officer's queries. Staring blankly into space, he gave no indication that he was aware of the danger he had been in or that he would not resume his dangerous activity once the officer left.

Finally, applying the third prong, appellant's detention "last[ed] no longer than [was] necessary to effectuate its purpose," and its scope was "carefully tailored to its underlying justification." *See id.* Initially, Zimmerer merely sat appellant down and asked him questions, a minor intrusion given that appellant had placed himself and people who were using the public road at that hour, in harm's way. And the extension of that intrusion only occurred after appellant proved unresponsive to the officer's questions and even to his presence. It was only then that the officer decided to take appellant to the hospital, a significant step but one tailored to the officer's growing concern that appellant required immediate medical attention. To safely transport appellant to the hospital, the officer handcuffed appellant, which was not only in accordance with departmental policy but, given his condition and unpredictable behavior, manifestly prudent. Thus, appellant's detention "last[ed] no longer than [was] necessary to effectuate its purpose," and its scope was "carefully tailored to its underlying justification." *See id.*

Still, appellant argues that the community caretaking function is inapplicable here. Quoting the words of the Supreme Court in *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) that the caretaking function must be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute" to be a basis for police action, appellant points to Officer Zimmerer's statement that he believed appellant might have been "under the influence of a controlled dangerous substance" after he failed to respond to the officer's questions, as evidence that here it was not.

As the Tenth Circuit found in *Garner,* just because the police may believe an individual might be intoxicated and therefore guilty of a minor or summary offense, does not foreclose the police from exercising their caretaking function. *See Garner,* 416 F.3d at 1216. Nor can we condone a policy that would discourage or prevent police from rendering vital assistance to people in peril simply because their peril is due to their state of intoxication.

Furthermore, although the officer thought that appellant might "possibly [be] under the influence of a controlled dangerous substance," he testified that he stopped appellant and later transported him to the hospital out of concern for appellant's safety and the safety of others, and not to detect or investigate any criminal conduct by appellant. The officer stated that he got out of his vehicle to follow appellant because he "wanted to make sure that [appellant] was okay;" that, in light of appellant's condition, he decided to take him to the hospital; that he handcuffed appellant not to consummate an arrest but in accordance with department policy; and that he could not be sure of what was wrong with appellant. Moreover, appellant does not contend that the detention was a pretext for investigating criminal activity. *See Commonwealth v. Waters*, 20 Va.App. 285, 290, 456 S.E.2d 527 (1995) ("No seizure, however limited, is a valid exercise of the community caretaking function if credible evidence indicates that the stop is a pretext for investigating criminal activity.").

■ Appellant also argues that his arrest occurred when Officer Zimmerer tried to place handcuffs on him and that that arrest was unlawful because it was without probable cause. And, because it was unlawful, he could use reasonable force to resist it. But appellant was not under arrest at that time; as we previously noted, he was then being lawfully detained pursuant to the officer's community caretaking function.

■ An arrest is "the detention of a known or suspected offender for the purpose of prosecuting him for a crime." *Longshore v. State*, 399 Md. 486, 502, 924 A.2d 1129 (2007) (citations omitted). Although "generally, a display of force by a police officer, such as putting a person in handcuffs, is considered an arrest," *id.* at 502–03, 924 A.2d 1129 (*citing Grier v. State*, 351 Md. 241, 252, 718 A.2d 211 (1998) (holding the defendant was arrested when he was put "on the ground"); *Morton v. State*, 284 Md. 526, 530, 397 A.2d 1385 (1979) (holding that the defendant was arrested when he was removed from a building and placed in a patrol car under

guard), and *Dixon v. State*, 133 Md.App. 654, 673, 758 A.2d 1063 (2000) (holding that defendant was arrested when his car was blocked and he was removed from it and then handcuffed)), the Court of Appeals has also observed that there are "very limited instances in which a show of force, such as placing a suspect in handcuffs, is not an arrest," including "when done to protect the officer" and "when done to prevent a suspect's flight." *Id.* at 509, 924 A.2d 1129 (*citing In re David S.*, 367 Md. 523, 789 A.2d 607 (2002); *Trott v. State*, 138 Md.App. 89, 770 A.2d 1045 (2001)).

In the instant case, Officer Zimmerer's initial attempt to place handcuffs on appellant did not amount to an arrest. Zimmerer did not detain appellant "for the purpose of prosecuting him for a crime." *See id.* at 502, 924 A.2d 1129 (citations omitted). He detained him for the purpose of taking him to the hospital. He also never told appellant that he was under arrest, nor did he believe that appellant was under arrest until after he resisted attempts to handcuff him. In fact, the officer told appellant that he was taking him, not to a police station, but to the hospital and further explained that he was being handcuffed so that he could be placed into the police cruiser and transported there.

When asked by the State why he handcuffed appellant, Officer Zimmerer replied, "It's departmental policy that everybody be handcuffed prior to being . . . put in the vehicle," and that "[s]econd of all, I didn't know what was wrong with him. Like I said, I believed he was possibly under the influence of a controlled dangerous substance." When the State inquired as to whether appellant was arrested at this point, the officer said, "no." Thus, appellant was handcuffed in accordance with department policy and "to protect the officer," *see id.* at 509, 924 A.2d 1129 (citation omitted), because he did not know "what was wrong with" appellant. The officer's attempt to handcuff was only transformed into an arrest, according to Officer Zimmerer, when appellant assaulted Officer Zimmerer in resisting that procedure.

**22**

Before concluding this opinion, we note that the State argues for the first time on appeal that appellant's "illegal resistance to a lawful detention, his use of excessive force, and his assault on several police officers warranted his arrest, and constituted intervening events that attenuated any alleged taint from his initial detention." As this argument was neither raised nor decided below, we shall not address it. Rule 8-131(a). Accordingly, we affirm the judgments of the circuit court.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**