
975 A.2d 877

**Francis Eugene WILSON, Jr.**

v.

**STATE of Maryland.**

**No. 91, Sept. Term, 2007.**

Court of Appeals of Maryland.

July 20, 2009.

Marc A. DeSimone, Jr., Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore), on brief, for petitioner/cross-respondent.

Kathryn Grill Graeff, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen., Baltimore), on brief, for respondent/cross-petitioner.

Argued before BELL, C.J., RAKER,* HARRELL, BATTAGLIA, GREENE, JOHN C. ELDRIDGE (Retired, specially assigned) and DALE R. CATHELL (Retired, specially assigned), JJ.

RAKER, Judge.

In this criminal appeal, we consider whether petitioner was seized in violation of the Fourth Amendment to the United States Constitution. We shall hold that the police officer's seizure of petitioner was an unlawful arrest and in violation of the Fourth Amendment to the United States Constitution. Accordingly, the trial court erred in denying his motion to suppress the evidence resulting from his unlawful seizure.

---

* Raker, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

## I.

Francis Eugene Wilson, petitioner, was indicted by the Grand Jury for Washington County on charges of second degree assault, resisting arrest, disarming a law enforcement officer, possession of marijuana, and disorderly conduct. He proceeded to trial before a jury and he was convicted of all the charges, except for disarming a law enforcement officer. He was sentenced to a term of imprisonment of three years on the resisting arrest charge, a consecutive term of one year imprisonment on the marijuana charge, and a concurrent term of imprisonment of sixty days for the disorderly conduct charge.

In the Circuit Court, petitioner filed a motion to suppress the search and seizure conducted by the police. The parties agreed that the trial court could rule on the motion as part of the trial rather than to hold a separate hearing on the motion. After police officer Zimmerer testified before the jury, the trial court excused the jury, and, after argument on the motion, ruled on the motion to suppress. As did the Court of Special Appeals, we shall focus on the officer's testimony up until the point when the court excused the jury and ruled on the motion to suppress.

Officer Zimmerer testified that at approximately 5:00 a.m. on February 13, 2005, while on routine patrol in Hagerstown, Maryland, in an unmarked police car, he saw something in the roadway. He thought the object was a trash bag or tarp that had blown into the roadway, and he activated his emergency lights. As he activated his emergency lights he noticed that the object was actually petitioner lying in the roadway. In response to the lights, petitioner stepped up in front of a van located one lane over to the right of the officer, went onto the sidewalk and started walking westbound, in the same direction as the unmarked police car. Officer Zimmerer then slowed down, left his lights on, and pulled up to the curb.

Petitioner continued walking past Officer Zimmerer, at which point the officer exited his vehicle and called to petitioner because "he wanted to see if he was okay." Although Officer Zimmerer was in an unmarked police car, he was

dressed in full uniform and his police badge was displayed. Petitioner did not respond and appeared to the officer "to be picking up his pace." The officer noticed some abrasions on petitioner's face and knuckles. He grabbed petitioner by his coat, sat him down on the curb, and began talking to him. The officer testified that he "tried to find out his name, ask him what was wrong with him, tried to find out where he lived at." In response, petitioner "just sat there with a blank stare." Officer Zimmerer testified that, based upon petitioner's mannerisms, although he did not know what was wrong with petitioner, he thought that he was "possibly under the influence of a controlled dangerous substance." He told petitioner that he was going to take him to the hospital and that he would have to be handcuffed before he was placed in the police cruiser. He testified that it was department policy to handcuff everyone prior to being put in a police cruiser. Officer Zimmerer then put petitioner's right hand behind his back to place the handcuffs on him. At that point, petitioner began to struggle.

The trial court then dismissed the jury and permitted defense counsel the opportunity to cross-examine the officer. Although he maintained that petitioner was not under arrest, the officer agreed that petitioner was not free to leave. The court then heard argument on the motion to suppress, and denied the motion. The court determined that, given the circumstances, the officer had a right to accost petitioner to see if anything was wrong and that "he had a right to do that because he was building reasonable articulable suspicion." The court stated as follows:

> "And perhaps maybe not at that time, but once he contacted the defendant, saw the injuries I think on his face and hands and knuckles, started gathering more information that something was seriously amiss, asked the defendant his name, asked other questions. The defendant just stared blankly after he had him sit down. So certainly this Officer had reasonable articulable suspicion to believe that something was going on with the defendant, either a crime was being committed because the defendant was under the

influence of drugs, perhaps not alcohol because he couldn't smell it, that the defendant was injured and needed help or assistance, that the defendant was having some type of mental or physical problem for which he needed to go to the hospital. So the officer had a right to detain, to do something that was less intrusive than an actual arrest in order to determine if a crime was being committed, had been committed, the defendant's identity to determine if he needed help or assistance, and there is a community caretaking function here. It's like ..., there have been cases where the appellate courts have said that hearing screams in a building, they have a right to run in there to see if anything or anyone was in need of assistance or a crime was being committed. Here the defendant, because of his actions, the observations of the injuries, seeing him in the middle of the road just lying there, the defendant could have gotten killed at that point in time by a vehicle coming along not observing him until it was too late and running over him. So the Officer had articulable suspicion that perhaps a crime had been committed, was being committed, that the defendant was injured, that the defendant needed help, or that in fact after observing him, that the defendant was either assaulted, having a medical issue, or was under the influence of drugs. So taking him into ..., detaining him was a perfectly valid thing to do at that point in time. And telling him, 'I'm taking you to the hospital,' was also perfectly valid either because there was a basis for a *Terry* type of stop and detention or there was a basis to take him to the hospital because there was cause, certainly cause to believe that the defendant was having an injury, an illness or a medical condition, or was so under the influence that he was potentially going to injure himself or others in the future."

The court denied the motion to suppress, the trial resumed, and additional facts not to be considered on the motion to suppress were presented to the jury. The jury heard that petitioner continued to resist the officer's attempts to place him in handcuffs and that the officer used pepper spray, a back-up officer used a taser stun gun on petitioner, and

petitioner was ultimately arrested, taken to the hospital, and then to jail. The jury heard also that while petitioner was being processed at the police booking station he requested to go to the bathroom, where he attempted to dispose of a baggie of marijuana.

The jury found petitioner guilty of second degree assault, resisting arrest, possession of marijuana, and disorderly conduct. As indicated, the court sentenced petitioner to four years of incarceration.

Petitioner noted a timely appeal to the Court of Special Appeals. Affirming the judgment of conviction, the intermediate appellate court held that petitioner was detained properly by the police in the exercise of their community caretaking function. *Wilson v. State,* 176 Md.App. 7, 932 A.2d 739 (2007). The court noted that the police caretaking function "permits searches of private property by police that would otherwise violate the Fourth Amendment where the police have initiated the search, not to investigate crime, but to 'aid persons in apparent need of assistance' or to protect property." *Id.* at 13–14, 932 A.2d at 743 (quoting *State v. Alexander,* 124 Md.App. 258, 269, 721 A.2d 275, 280 (1998)). The question not decided by Maryland appellate courts, the court observed, is whether the caretaking function extends beyond searches to *seizures* of persons. *Id.* at 14, 932 A.2d at 743. The intermediate appellate court held that there is no basis, in logic or policy, for drawing a distinction between searches and seizures for community caretaking purposes, because, the same policy underlies both—protection of citizens from likely physical harm. *Id.*

We granted Wilson's petition for writ of certiorari to answer the following question:

"Did all of the evidence of guilt adduced against petitioner flow from a violation of his Fourth Amendment right against unreasonable seizure where a police officer, lacking even a reasonable suspicion of criminal activity, approached petitioner in full uniform, with weapon and badge displayed, and emergency lights activated; grabbed petitioner by the arm

from behind, interrogated him, informed petitioner that he would be removed from the scene in the rear of a squad car, and then sought to place handcuffs upon him?"
*Wilson v. State*, 402 Md. 352, 936 A.2d 850 (2007).[1]

## II.

In reviewing the trial court's denial of a motion to suppress, we review the evidence in the light most favorable to the State. *Owens v. State*, 399 Md. 388, 403, 924 A.2d 1072, 1080 (2007). We accept the court's factual findings, unless clearly erroneous, but the ultimate question of reasonableness of a search or seizure under the Fourth Amendment or Article 26 of the Maryland Declaration of Rights is a legal conclusion that we review *de novo*. *Lewis v. State*, 398 Md. 349, 358, 920 A.2d 1080, 1085 (2007). Our review of the propriety of the court's ultimate ruling is based ordinarily upon the evidence presented at the suppression hearing, and in the instant case, by agreement of the parties, on the evidence related to the legality of the search or seizure. *Williamson v. State*, 398 Md. 489, 500, 921 A.2d 221, 228 (2007).

Petitioner presents two arguments.[2] First, he argues that his warrantless arrest was without probable cause to believe

---

1. We granted the State's conditional cross-petition, which presented the following question:

 "Did Wilson's assault on several police officers and his subsequent abandonment of drugs constitute intervening events that attenuated any alleged taint from his initial detention?"

 *Wilson*, 402 Md. 352, 936 A.2d 850. Because the trial judge denied petitioner's motion to suppress evidence, the State did not have an opportunity, or need, to present its alternative argument related to intervening factors and attenuation to the trial court. The issue was not argued or developed below and we will not consider the question on this record; but, because we are reversing the judgment below, the State is free to present the argument to the trial court in any further proceedings.

2. Because the Petitioner has not asserted a Fourteenth Amendment liberty interest in the right to refuse medical treatment, an interesting issue about which we have not had the opportunity to opine, we will not address it in this case. *See* Paul C. Redrup, *When Law Enforcement*

that he was engaged in criminal activity, and consequently, he was privileged to resist the officer's attempt to place handcuffs on him. Petitioner's argument is that he was arrested when Officer Zimmerer approached him, grabbed him by the arm, asked him questions, and then, attempted to handcuff him before placing him into the back seat of the officer's police car. In petitioner's view, the officer's use of handcuffs was the ultimate display of police authority over petitioner, and it required a showing of probable cause. Because probable cause was lacking, petitioner continues, the arrest was unlawful. Therefore, anything that flowed from the unlawful arrest must be seized, and the resisting charge must fail because petitioner had a legal right to resist an unlawful arrest.

Petitioner's second argument involves the "community caretaking" function of the police. He argues that the community caretaking doctrine does not permit involuntary, warrantless seizures of individuals, and even if the doctrine could be extended to encompass seizure of individuals, the seizure of petitioner is outside the confines of this doctrine and thus violates the Fourth Amendment. Petitioner argues that this doctrine "has no prior countenance in the law of this State, and this Court must reject the Court of Special Appeals' wrongful inclusion of this doctrine within the law of Maryland, both as a matter of law, and a matter of policy." Brief of petitioner at 20. It is petitioner's view that the community caretaking doctrine is very limited in scope and only applies to entries onto land and searches of effects. Alternatively, petitioner argues that even if the doctrine is to be recognized in Maryland, the officer was acting outside of its narrow scope when he sought to handcuff petitioner.

The State argues that petitioner was not arrested, but instead was reasonably detained by Officer Zimmerer pursuant to the police community caretaking function. Because petitioner appeared to the officer to be in need of assistance, it was reasonable for the officer to transport petitioner to the

---

*and Medicine Overlap: The Community Caretaker Exception and the Right to Refuse Medical Treatment,* 38 U. Tol. L.Rev. 741 (2006).

hospital, as well as to place handcuffs on petitioner before putting him into the police car. Alternatively, the State argues that even if the initial detention was improper, petitioner's assault upon the officer constituted an intervening event that attenuated any taint from his initial, *arguendo* illegal detention, and therefore any evidence seized by the police was not the fruit of any illegal detention. Finally, the State argues that even if the initial detention was illegal and petitioner's assault on the officer did not constitute an intervening event that attenuated any alleged taint from the initial detention, the only evidence to be suppressed would be the marijuana.

## III.

The Fourth Amendment to the United States Constitution [3] protects persons and places from unreasonable intrusions by the government. The Fourth Amendment does not protect against all seizures, however, but only against *unreasonable* searches and seizures. *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985). In assessing whether a search or seizure was reasonable, "[t]he touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878–79, 20 L.Ed.2d 889 (1968)). Reasonableness "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Maryland v. Wilson*, 519 U.S. 408, 411, 117 S.Ct. 882, 885, 137 L.Ed.2d 41

---

**3.** The Fourth Amendment to the United States Constitution reads as follows:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST amend. IV.

(1997) (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975))

We turn to the State's community caretaking argument. The State justifies Officer Zimmerer's actions as conduct falling within the police "community caretaking function." In *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973), the Supreme Court first used the term "community caretaker," and validated the police impoundments of automobiles, without underlying probable cause, on the grounds that the police needed to act to protect the public from hazards and interrupted traffic. In that case, the police in Wisconsin were called to an accident scene in which Dombrowski, a Chicago police officer, while driving drunk, had crashed his car into a bridge abutment. Believing that Chicago police officers were required to carry their service revolvers, police searched his car unsuccessfully for the service revolver, and then towed the car to the police station. Dombrowski was arrested for drunk driving, then hospitalized overnight for his injuries. At the police station the next day, the police looked for the service revolver in the trunk of Dombrowski's car. They saw evidence of a murder in the trunk. At trial, the State used the evidence from Dombrowski's car to convict him of the murder which was unrelated to the automobile accident.

The United States Court of Appeals for the Seventh Circuit held that the warrantless search and seizure violated Dombrowski's rights under the Fourth Amendment. *Dombrowski v. Cady,* 471 F.2d 280, 286 (7th Cir.1972). The United States Supreme Court reversed and upheld the search and seizure, holding that the "caretaker" search and seizure was reasonable because it was "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute" and because the search was aimed at ensuring the safety of the general public, rather than uncovering evidence related to crime detection. *Cady,* 413 U.S. at 441, 447, 93 S.Ct. at 2528, 2531.

Noting that the police were required to take control and custody of Dombrowski's car because it constituted a nuisance and Dombrowski, because of his condition, could not care for it himself, the Court reasoned that the police had reason to worry that a revolver was inside the car, on an unattended lot, and thereby posed a hazard to the community. The Court concluded that it was reasonable for the police to search Dombrowski's trunk in the exercise of their "community caretaking" responsibilities, "to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." *Id.* at 443, 93 S.Ct. at 2529. In upholding the search, the Supreme Court explained as follows:

> "Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, *for want of a better term, may be described as community caretaking functions,* totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."

*Id.* at 441, 93 S.Ct. at 2528 (emphasis added).

Since *Cady,* many courts have considered the breadth and scope of the community caretaking function of law enforcement officers.[4] Some courts have construed the notion nar-

---

4. Some states have enacted community caretaking statutes. *See, e.g.,* OR REV STAT § 133.033 (2007). That statute provides, in part:

 "(1) Except as otherwise expressly prohibited by law, any peace officer of this state ... is authorized to perform community caretaking functions.
 (2) As used in this section, 'community caretaking functions' means any lawful acts that are inherent in the duty of the peace officer to

rowly and others have given it wide berth. The so-called doctrine does not have a single meaning, but is rather an umbrella that encompasses at least three other doctrines: (1) the emergency-aid doctrine, (2) the automobile impoundment/inventory doctrine,[5] and (3) the public servant exception.

Some courts have limited community caretaking functions to automobiles and have declined to expand it to the warrantless entry of a residence or business. *See, e.g., United States v. McGough,* 412 F.3d 1232, 1238 (11th Cir.2005) (stating "we

serve and protect the public. 'Community caretaking functions' includes, but is not limited to:
(a) The right to enter or remain upon the premises of another if it reasonably appears to be necessary to:
(A) Prevent serious harm to any person or property;
(B) Render aid to injured or ill persons; or
(C) Locate missing persons."
OR.REV.STAT. § 133.033.

5. The second permutation of the police community caretaking function is the inventory search. In *South Dakota v. Opperman,* 428 U.S. 364, 368, 96 S.Ct. 3092, 3097, 49 L.Ed.2d 1000 (1976), the United States Supreme Court set out the caretaker purposes underlying the automobile inventory search. Recognizing and reiterating the distinction between a home and an automobile for Fourth Amendment purposes, and the lesser expectation of privacy in an automobile, the Court observed that law enforcement officials are brought into frequent contact with automobiles, mostly in a noncriminal nature. *Id.* Using the term "community caretaking function," the Court stated:
"In the interests of public safety and as part of what the Court has called 'community caretaking functions,' automobiles are frequently taken into police custody. Vehicle accidents present one such occasion. To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities. Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."
*Id.* at 368–69, 96 S.Ct. at 3097 (footnotes and citations omitted). The purposes underlying this warrant exception include a duty to the owner of the car as well as a way to protect the police from dangerous items and from claims for damaged or lost property. Almost all states have upheld the caretaking function in this regard. *Id.* at 369–71, 96 S.Ct. at 3097–98.

have never explicitly held that the community caretaking functions of a police officer permits the warrantless entry into a private home"); *United States v. Erickson*, 991 F.2d 529 (9th Cir.1993) (refusing to extend community caretaking function to warrantless search of private home); *United States v. Pichany*, 687 F.2d 204 (7th Cir.1982) (declining to extend community caretaking function to warrantless search of warehouse); *State v. Gill*, 755 N.W.2d 454 (N.D.2008) (refusing to apply exception to warrantless search of dwelling). Other courts have addressed community caretaking intrusions in contexts other than automobile stops. *See, e.g., United States v. Garner*, 416 F.3d 1208 (10th Cir.2005) (detention of individual); *United States v. Miller*, 589 F.2d 1117 (1st Cir.1978) (search of a yacht); *State v. Dube*, 655 A.2d 338 (Me.1995) (search of apartment); *Commonwealth v. Waters*, 20 Va.App. 285, 456 S.E.2d 527 (1995) (detention of individual).

This Court has not previously considered the breadth of community caretaking functions, nor has it expressly adopted the "community care doctrine" as an exception to the warrant requirement of the Fourth Amendment as it relates to individuals outside of the home and in need of aid. *See Lewis*, 398 Md. at 373, 920 A.2d at 1094. Nevertheless, we have long recognized at least two categories of police activities that purportedly fall within community caretaking functions: (1) the automobile impoundment/inventory doctrine,[6] and (2) the

---

6. In *Duncan and Smith v. State*, 281 Md. 247, 256, 378 A.2d 1108, 1114 (1977), we noted that "[a]ctivities concerning automobiles carried out by local police officers in the interests of public safety and as 'community caretaking functions' frequently result in the automobile being taken in custody." Citing *Opperman*, 428 U.S. at 368–69, 96 S.Ct. at 3097, we further observed the following:

"Vehicle accidents present one such occasion. To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities. Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and

emergency aid doctrine. The emergency aid doctrine and the public welfare function often overlap and both appear to be at issue in this case.

The emergency aid doctrine was recognized by the United States Supreme Court in *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978), as an exception to the Fourth Amendment warrant requirement, based upon the premise that law enforcement officers should be able to act without a warrant when they reasonably believe a person needs immediate attention. Application of the emergency aid doctrine is firmly established in Maryland.

In *Davis v. State,* 236 Md. 389, 392–93, 204 A.2d 76, 79–80 (1964), firemen and police were called to a house by an individual who discovered a dead body in the back yard. After they arrived, police noticed a trail of blood leading from the victim to the rear door, and they were able to observe a pair of human feet inside the home. The officers then entered the home and discovered defendant sleeping on a couch along with evidence that he committed the crime. *Id.* at 393, 204 A.2d at 79. This Court held that the police officers' warrantless entry into the home was a reasonable search under the emergency aid doctrine. *Id.* at 395, 204 A.2d at 80. The Court reasoned that the officers were required to "offer aid to the person within the house on the very distinct possibility that this person had suffered at the hands of the perpetrator of the homicide discovered in the back yard." *Id.* at 395–96, 204 A.2d at 80.

Reiterating the general rule that a warrant is required to enter a home, the Court noted that an entry made during an emergency situation is a recognized exception. The Court held that the police entry onto the defendant's property was for the purpose of investigating a reported death, and thus, the officers were legitimately on the premises and were not trespassers. Then, "in light of the gory scene which confront-

---

remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."
*Duncan,* 281 Md. at 256, 378 A.2d at 1114.

ed the police in the back yard of the Davis' home, their duties with regard to investigation of the death of the person found there commanded that they determine whether more than one person had been victimized in the carnage which had obviously taken place." *Id.* at 395, 204 A.2d at 80. The entry in the house was held to be lawful, on the following basis:

"We find that the entrance of the police officers into the house was reasonable under the circumstances then existing in order to determine whether the feet which were seen therein by Lt. Denell were those of a person in distress, immediate aid to whom might, under similar circumstances, have preserved a human life. Basic humanity required that the officers offer aid to the person within the house on the very distinct possibility that this person had suffered at the hands of the perpetrator of the homicide discovered in the back yard. The delay which would necessarily have resulted from an application for a search warrant might have been the difference between life and death for the person seen exhibiting no signs of life within the house. The preservation of human life has been considered paramount to the constitutional demand of a search warrant as a condition precedent to the invasion of the privacy of a dwelling house. As aptly stated by Judge Burger in *Wayne v. United States*, 318 F.2d 205, 212 (D.C.Cir.1963):

'Breaking into a home by force is not illegal if it is reasonable in the circumstances. * * * But a warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. Acting in response to reports of 'dead bodies,' the police may find the 'bodies' to be common drunks, diabetics in shock, or distressed cardiac patients. But the business of policemen and firemen is *to act*, not to speculate or meditate on whether the report is

correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process. Even the apparently dead often are saved by swift police response. A myriad of circumstances could fall within the terms 'exigent circumstances' referred to in *Miller v. United States*, [357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958) ] *e.g.*, smoke coming out a window or under a door, the sound of gunfire in a house, threats from the inside to shoot through the door at police, reasonable grounds to believe an injured or seriously ill person is being held within.'

See also People v. Roberts, 47 Cal.2d 374, 303 P.2d 721 (1956)."

*Id.* at 395–96, 204 A.2d at 80–81; *see also Lebedun v. State*, 283 Md. 257, 272–73, 390 A.2d 64, 71 (1978).

The Court of Special Appeals, in *Alexander*, 124 Md.App. 258, 721 A.2d 275, addressed the community caretaking function in the context of protecting a home where police found an open door. Judge Charles E. Moylan, Jr., writing for the panel, commented upon the "Aiding Persons in Need of Assistance" prong of the doctrine and noted as follows:

"Whether labeled a 'community caretaking function' or not, one such duty is to aid persons in apparent need of assistance. If when glancing through the window of a home from the public sidewalk, for instance, the police see an elderly man clutch his chest and fall to the floor or even if they only see a prostrate figure already on the floor, their duty is to respond promptly to a possible medical emergency. Undue concern with Fourth Amendment niceties could yield a dead victim who might otherwise have survived."

*Id.* at 269, 721 A.2d at 280. The court reiterated that the touchstone of the doctrine is that the police "were engaged in a community caretaking function and not in an investigative function and that the appropriate standard for judging such police behavior is that of general reasonableness." *Id.* at 280, 721 A.2d at 286.

Maryland courts have upheld the emergency aid doctrine in various other circumstances. *See, e.g., Carroll v. State,* 335 Md. 723, 646 A.2d 376 (1994) (holding entry into home to be reasonable when law enforcement officers have probable cause to believe that a burglary is either in progress or recently has been committed; the exigencies of the situation permit the officers to enter the premises without a warrant to search for intruders and to protect an occupant's property); *Oken v. State,* 327 Md. 628, 612 A.2d 258 (1992) (police respond to a missing persons report); *Alexander,* 124 Md.App. 258, 721 A.2d 275 (police entered home in response to neighbor's call stating that he believed the home had been broken into and the residents were away); *Burks v. State,* 96 Md.App. 173, 624 A.2d 1257 (1993) (police entered motel room without a warrant to rescue two kidnaping victims).

The caretaking function has been recognized also as a general public welfare rule or what is sometimes known as the "public servant" exception. When the police act to protect the public in a manner outside their normal law enforcement function, many courts have applied the doctrine to validate many warrantless searches and seizures, and in a variety of circumstances. *Garner,* 416 F.3d 1208 (officer exercised community caretaking function when he told defendant to come back and sit down so that fire department could examine him); *Miller,* 589 F.2d 1117 (boarding an abandoned boat and finding evidence of narcotics trafficking was lawful under the community caretaking doctrine because the possible drowning of the boat owner was being investigated); *People v. Ray,* 21 Cal.4th 464, 88 Cal.Rptr.2d 1, 981 P.2d 928 (1999) (officers lawfully entered apartment in response to a call that it was in shambles and its door had been left ajar all day, to check on the welfare of the persons inside the apartment); *People v. Luedemann,* 222 Ill.2d 530, 306 Ill.Dec. 94, 857 N.E.2d 187 (2006) (officer exercised community caretaking function in checking on defendant, who appeared intoxicated and was seated in driver's seat of parked car at night); *Dube,* 655 A.2d 338 (initial entry of police into defendant's apartment to oversee custodian's plumbing repair lawful as a community

caretaking function); *Waters,* 456 S.E.2d 527 (officers' commu-
nity caretaking functions include checking on well-being of
individual in a public space who appears ill or in need of
assistance); *State v. Kinzy,* 141 Wash.2d 373, 5 P.3d 668
(2000) (community caretaking function extends to officer ap-
proaching at risk youth in high narcotics trafficking areas to
check on their safety).

The common denominator throughout these cases is the
non-criminal, non-investigatory police purpose. In *Cady,* the
police were responding to a traffic accident rather than inves-
tigating criminal activity or seeking to implicate the defendant
in a crime. The Supreme Court's recognition of a separation
between investigatory and non-investigatory functions of the
police underlies the application of the public servant exception
beyond the automobile impoundment/inventory search to justi-
fy initial encounters and intrusions in other circumstances.

It is the public servant/general public welfare rule that the
State invokes in this case to justify the police officer's initial
contact with petitioner. Law enforcement contact in the
noncriminal context arises most often in two general circum-
stances. The first is when police approach parked cars where
the driver appears to be sick or when the car appears to be
functioning improperly. A second area, which is at issue in
the case *sub judice,* is when law enforcement officers approach
pedestrians who appear to need assistance because they ap-
pear sick, in danger or in need of some emergency assistance.
These encounters are commonly justified only when the pur-
pose of the police is unrelated to criminal investigations.

The "public safety" doctrine is based upon a recogni-
tion that law enforcement officers perform a myriad of func-
tions and responsibilities, the enforcement of criminal laws
being only one of them. *Williams v. State,* 962 A.2d 210, 216–
17 (Del.2008); 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE,
§ 5.4(C) (4th ed. 2004). The Supreme Court of Delaware, in
*Williams,* described the underpinnings of the doctrine as
follows:

"The modern police officer is a 'jack-of-all-emergencies,' with complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses; by default or design he [or she] is also expected to aid individuals who are in danger of physical harm, assist those who cannot care for themselves, and provide other services on an emergency basis. To require reasonable articulable suspicion of criminal activity before police can investigate and render assistance in these situations would severely hamstring their ability to protect and serve the public."

*Williams,* 962 A.2d at 216–17 (internal citations omitted).

 As did the Delaware Supreme Court, as well as the majority of jurisdictions in the country, we find that the public welfare component of the community caretaking function of the police "encompasses a non-investigative, non-criminal role to ensure the safety and welfare of our citizens," reflecting that principle that the role of the police is not limited to the investigation, detection and prevention of crime in this State. *See id.* at 218; *see also State v. Lovegren,* 310 Mont. 358, 51 P.3d 471, 475–76 (2002).

Many courts have embraced the community caretaking doctrine/public welfare exception, thereby permitting police to investigate or aid citizens who may need assistance or are in danger. The exercise of this power by the police is not without strict limits, however. The caretaking function of the police must always be balanced with the rights and protections enjoyed by our citizens under the United States Constitution and the Maryland Declaration of Rights. *See, e.g., United States v. King,* 990 F.2d 1552, 1560 (10th Cir.1993) (stating that "[w]hether the seizure of a person by a police officer acting in his or her noninvestigatory capacity is reasonable depends on whether it is based on specific articulable facts and requires a reviewing court to balance the governmental interest in the police officer's exercise of his or her 'community caretaking function' and the individual's interest in being free from arbitrary government interference").

The Delaware Supreme Court fashioned a test to protect fundamental rights, based upon the Montana approach. *Williams,* 962 A.2d at 219. The test is formulated as follows:

"[W]e must ascertain that the encounter was part of the police officer's community caretaker function; that the officer's actions during it remained within the caretaking function; and that once the caretaking function had ceased, either the encounter was terminated, or some other justification existed for its continuance."

*Id.* The specific test formulated by Montana, and subsequently adopted in Delaware reads as follows:

"First, as long as there are objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril, then that officer has the right to stop and investigate. Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated then any actions beyond that constitute a seizure implicating not only the protections provided by the *Fourth Amendment,* but more importantly, those greater guarantees afforded under [state law]."

*Lovegren,* 51 P.3d at 475–76.

The Court of Special Appeals adopted the three-part test to determine whether a detention by police was pursuant to their community caretaking function. The test, as articulated by the United States Court of Appeals for the Tenth Circuit in *Garner,* 416 F.3d 1208, for a detention to qualify as an exercise of the community caretaking function, must be:

"(1) based upon specific and articulable facts which ... reasonably warrant an intrusion into the individual's liberty;

(2) the government's interest must outweigh the individual's interest in being free from arbitrary governmental interference; and

(3) the detention must last no longer than is necessary to effectuate its purpose, and its scope must be carefully tailored to its underlying justification."

*Wilson,* 176 Md.App. at 16–17, 932 A.2d at 744–45 (citing *Garner,* 416 F.3d at 1213).

As did the Court of Special Appeals, and our sister jurisdictions, with a goal toward assuring that the exercise of the public welfare community caretaking function is conducted reasonably, we adopt a somewhat similar test. To enable a police officer to stop [7] a citizen in order to investigate whether that person is in apparent peril, distress or in need or aid, the officer must have objective, specific and articulable facts to support his or her concern. If the citizen is in need of aid, the officer may take reasonable and appropriate steps to provide assistance or to mitigate the peril. Once the officer is assured that the citizen is no longer in need of assistance, or that the peril has been mitigated, the officer's caretaking function is complete and over. Further contact must be supported by a warrant, reasonable articulable suspicion of criminal activity, or another exception to the warrant requirement. The officer's efforts to aid the citizen must be reasonable. In assessing whether law enforcement's actions were reasonable, we consider the availability, feasibility and effectiveness of alternatives to the type of intrusion effected by the officer. *See State v. Kramer,* 315 Wis.2d 414, 759 N.W.2d 598, 612 (2009).

---

7. We take no position in this case as to whether the public welfare/community caretaking function of the police would permit the police to stop a moving vehicle on the highway. Because many of our sister states have noted abuse of this authority by police, and because this issue has not been briefed nor argued in this case, we do not address those circumstances and await opining on the issue until it is properly presented. *See, e.g., Doheny v. Comm'r of Pub. Safety,* 368 N.W.2d 1, 1–2 (Minn.Ct.App.1985) (refusing to apply the exception to the stop of a moving car); *State v. Sarhegyi,* 492 N.W.2d 284, 288 n. 1 (N.D.1992) (focusing on the difference between stopped and moving cars); *State v. Anderson,* 149 Wis.2d 663, 439 N.W.2d 840, 847–48 (1989) (stopping a moving car improper under community caretaking analysis) *overruled on different grounds* by *State v. Anderson,* 155 Wis.2d 77, 454 N.W.2d 763 (1990).

## IV.

We now assess the reasonableness of Officer Zimmerer's contact with petitioner. Some courts have analyzed the police encounter in the context of whether the contact is a seizure; others have determined that it is not a seizure but that the police conduct was reasonable. We have made clear that the Fourth Amendment guarantees are not implicated in all circumstances where the police have contact with an individual. *See Swift v. State*, 393 Md. 139, 149, 899 A.2d 867, 873–74 (2006) (citing *California v. Hodari D.*, 499 U.S. 621, 625–26, 111 S.Ct. 1547, 1550–51, 113 L.Ed.2d 690 (1991)); *Scott v. State*, 366 Md. 121, 133, 782 A.2d 862, 869 (2001). We employed a three-tier analysis of police interaction with citizens. *Haley v. State*, 398 Md. 106, 131–32, 919 A.2d 1200, 1214–15 (2007); *Swift*, 393 Md. at 149–51, 899 A.2d at 873. The most intrusive encounter is an arrest, which requires probable cause to believe that a person has committed or is committing a crime. The second category is the investigatory stop or detention, known commonly as a *Terry* stop, an encounter considered less intrusive than a formal custodial arrest and one which must be supported by reasonable suspicion that a person has committed or is about to commit a crime and permits an officer to stop and briefly detain an individual. The third contact is considered the least intrusive police-citizen contact, and one which involves no restraint of liberty and elicits an individual's voluntary cooperation with non-coercive police contact. A consensual encounter, or a mere accosting, need not be supported by any suspicion and because an individual is free to leave at any time during such an encounter, the Fourth Amendment is not implicated; thus, an individual is not considered to have been "seized" within the meaning of the Fourth Amendment. Regardless of whether the court has held the contact to be a seizure or not, all courts seem to require that the officer's actions be reasonable. *Swift*, 393 Md. at 149–51, 899 A.2d at 873–74.

Officer Zimmerer's initial encounter with petitioner did not rise to the level of a seizure implicating the Fourth

Amendment. Writing for the majority in *Crosby v. State,* 408 Md. 490, 503, 970 A.2d 894, 901 n. 14 (2009), Judge Harrell noted that a "mere accosting" is the lowest level of an encounter that an individual may have with the police. An accosting occurs when a police officer, as in the case *sub judice,* simply calls out to an individual without any show of authority or signs of force or weapons. The Fourth Amendment does not apply to an accosting because "such an encounter does not entail any show of authority by the police." *Crosby,* 408 Md. at 503, n. 14, 970 A.2d at 901.

■ The officer saw petitioner lying in the middle of the roadway and initially simply called out to check upon his well-being. From the time that Officer Zimmerer grabbed petitioner by his coat, however, sat him down on the curb and began talking to him, a reasonable person would have believed that he was no longer free to leave. This belief was reinforced by Officer Zimmerer conveying to petitioner that he was going to take him to the hospital after placing him in handcuffs in the police cruiser. At the time that Officer Zimmerer detained petitioner so that he was no longer free to leave, the encounter between the officer and petitioner rose to the level of a seizure, and we therefore examine it under the Fourth Amendment.

■ The officer's encounter with petitioner was conducted to provide emergency aid to petitioner or in the officer's capacity to protect the public welfare. Officer Zimmerer testified that he approached petitioner because of his concern for petitioner's health and safety, and when he first observed petitioner, Officer Zimmerer approached him to "see if he was okay." The officer had no indication or reason to suspect that petitioner was involved in criminal activity and, therefore, he could not have entertained the reasonable articulable suspicion required to make a *Terry* stop. *Terry,* 392 U.S. 1, 88 S.Ct. 1868. Neither petitioner's silence when the officer accosted him, nor the abrasions on petitioner's face and knuckles, provided the officer with sufficient probable cause to arrest him. The encounter between Officer Zimmerer and petitioner

**442**

could reasonably continue because, consistent with the public welfare function, Officer Zimmerer wanted to find out petitioner's "name, ask him what was wrong with him, . . . find out where he lived at." The officer then determined that petitioner should be examined at a hospital and placed handcuffs on him so that he could receive proper medical assistance. The question then becomes whether Officer Zimmerer's seizure of petitioner was *reasonable,* notwithstanding the absence of a warrant.

 We hold that Officer Zimmerer's decision to place petitioner in handcuffs and to transport him to the hospital in his police cruiser was not carefully tailored to the underlying justification for the seizure. Just as an intrusion conducted pursuant to the community caretaking doctrine must be "limited in scope to the extent necessary to carry out the caretaking function," *Opperman,* 428 U.S. at 375, 96 S.Ct. at 3100; *United States v. Andrews,* 22 F.3d 1328, 1334 (5th Cir.1994), so too must a seizure conducted to provide emergency aid. This does not mean that the method of intrusion must be the least intrusive one available, *see Illinois v. Lafayette,* 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983) [8]; *Plakas v. Drinski,* 19 F.3d 1143, 1149 (7th Cir.1994), but the intrusion must be "reasonably related in scope to the circumstances which justified the interference in the first place." *New Jersey v. T.L.O.,* 469 U.S. 325, 341, 105 S.Ct. 733, 743, 83 L.Ed.2d 720 (1985).

In assessing whether law enforcement's actions were reasonable, we consider the availability, feasibility and effectiveness of alternatives to the type of intrusion effected by the officer. Placing handcuffs on petitioner to transport him to

---

**8.** In *Lafayette,* the United States Supreme Court noted that "[t]he reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means." *Lafayette,* 462 U.S. at 647, 103 S.Ct. at 2610. The Court pointed out that in *Cady,* "[the] fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." *Id.* at 648, 103 S.Ct. at 2610.

the hospital for medical treatment, under the circumstances herein, was not reasonable. Petitioner committed no crime, and was not suspected of criminal activity. If medical treatment was necessary, the record does not indicate any reason why an ambulance was not called. Officer Zimmerer's actions exceeded those permitted under the community caretaker function. His seizure of petitioner was therefore unreasonable.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AND REMAND TO THAT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY WASHINGTON COUNTY.**

Dissenting Opinion by HARRELL, J., which CATHELL, J., joins.

I dissent. The Majority opinion is fine until its very end (Maj. op. at 442–43, 975 A.2d 893) when it misapplies its careful analysis and recitation of the community care-taking function as it should be applied in Maryland. The Majority holds that Officer Zimmerer violated Wilson's Fourth Amendment rights when he handcuffed Wilson and transported him to the hospital. Maj. op at 442, 975 A.2d 892. Calling it "unreasonable" (i.e., not narrowly tailored) to handcuff Wilson in order to place him in the cruiser for such transport, the Majority finds it important to its conclusion that it discerns no reason in the record for why an ambulance was not summonsed for the purpose. Maj. op. at 441–42, 975 A.2d 892. The Majority's reasoning overrides the latitude that ought to be granted to law enforcement officers to make discretionary calls as to what additional public services may be necessary under varying circumstances. The record tells me that, other than some scraped knuckles on his hands and his general catatonic behavior, Wilson's observed condition may not have commanded an ambulance and an EMT. In any event, what

makes the Majority imagine that, under these circumstances, Wilson's liberty would not have been restricted by restraints had he been transported by ambulance? Transport by police vehicle seems eminently reasonable, appropriate to the occasion, and fiscally sound. To call Officer Zimmerer's exercise of judgment here unreasonable and unconstitutional is wrong.

As Chief Judge Krauser stated for the Court of Special Appeals in its opinion in this matter:

[A]lthough the officer thought that [Wilson] might "possibly [be] under the influence of a controlled dangerous substance," he testified that he stopped [him] and later transported him to the hospital out of concern for [Wilson's] safety and the safety of others, and not to detect or investigate any criminal conduct by [Wilson]. The officer stated that he got out of his vehicle to follow [Wilson] because he "wanted to make sure that [Wilson] was okay"; that, in light of [Wilson's] condition, he decided to take him to the hospital; that he handcuffed [him] not to consummate an arrest but in accordance with department policy; and that he could not be sure of what was wrong with [Wilson].

* * *

In the instant case, Officer Zimmerer's initial attempt to place handcuffs on [Wilson] did not amount to an arrest. Zimmerer did not detain [Wilson] "for the purpose of prosecuting him for a crime." He detained him for the purpose of taking him to the hospital. He also never told [Wilson] that he was under arrest, nor did he believe that [Wilson] was under arrest until after he resisted attempts to handcuff him. In fact, the officer told [Wilson] that he was taking him not to a police station, but to the hospital and further explained that he was being handcuffed so that he could be placed into the police cruiser and transported there.

When asked by the State why he handcuffed [Wilson], Officer Zimmerer replied, "It's departmental policy that everybody be handcuffed prior to being ... put in the

vehicle," and that "[s]econd of all, I didn't know what was wrong with him. Like I said, I believed he was possibly under the influence of a controlled dangerous substance." When the Sate inquired as to whether [Wilson] was arrested at this point, the officer said, "no." Thus, [Wilson] was handcuffed in accordance with department policy and "to protect the officer," because he did not know "what was wrong with" [him]. The officer's attempt to handcuff was only transformed into an arrest, according to Officer Zimmerer, when [Wilson] assaulted Officer Zimmerer in resisting that procedure.

176 Md.App. 7, 20–21, 932 A.2d 739, 746–47 (2007).

The Court of Special Appeals got it right, in my view. Accordingly, I would affirm its judgment that Wilson's motion to suppress was denied correctly by the Circuit Court for Washington County.

Judge CATHELL has authorized me to state that he joins in this dissent.