# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3332

_____

Tracy Allen Samuelson,                          *
                                                *
      Plaintiff - Appellant,          *
                                                *
   v.                                        *
                                                *  Appeal from the United States
City of New Ulm; Officers Jeremey               *  District Court for the
Brennan; Andrew Leif; Jerry Losinski,           *  District of Minnesota.
New Ulm Police officers, personally,            *
and in their official capacities as             *
New Ulm police officers,                        *
                                                *
      Defendants - Appellees.         *

_____

Submitted: May 9, 2005
Filed: July 20, 2006

_____

Before WOLLMAN, BRIGHT, and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

Tracy Allen Samuelson called the police to report intruders breaking into his garage. He went outside, where police officers took him for an intruder, and he was apprehended. Because of his behavior, the officers transported him to a medical facility, and a physician authorized a seventy-two-hour hold. He sued the individual police officers and the City of New Ulm under 42 U.S.C. § 1983 and Minnesota law, alleging, *inter alia*, excessive force and unreasonable seizure. Samuelson appeals the

district court's grant of summary judgment in favor of the defendants on all claims. We affirm in part and reverse in part.

I

The facts, viewed in the light most favorable to Samuelson, the nonmoving party, Siebrasse v. U.S. Dep't of Agric., 418 F.3d 847, 850 (8th Cir. 2005), are as follows. On the night of January 18, 2003, Samuelson, a private homeowner, woke up and noticed his outdoor motion lights were on. He says he saw three people in his backyard, shouted out the window at them, and watched them flee over his fence. He went back to bed but was later awakened and noticed his motion light on again. This time he saw two people in his backyard trying to get into his garage, and he then called 911. Although Samuelson's conversation with the dispatcher was incoherent at times, the operator elicited enough information to conclude he was complaining of the presence of burglars in his garage. New Ulm police officers were dispatched to his residence.

After the dispatcher alerted Samuelson the police had arrived, he walked outside to meet the police by the back fence. Officer Jeremey Brennan saw Samuelson through the fence but did not announce his presence. Samuelson pulled himself on the fence when Brennan ordered him to the ground. Samuelson then complied. Brennan also ordered Samuelson to kneel with his hands in the air. Samuelson complained of the muddy ground conditions but complied with the order. Brennan asked Samuelson who owned the garage; Samuelson replied it was his. When Brennan noticed the cordless phone in Samuelson's rear pocket, he asked if Samuelson lived there. He responded in the affirmative.

Samuelson testified an officer got on top of him and punched him on the ribs, head, and neck. Then other officers piled on. Samuelson asked: "What did I do? I am the landowner." An officer responded: "You know what you did. And you keep

it up and you are really going to get a beating." According to Samuelson, he did not retaliate or try to escape the officers.

Only after Samuelson was handcuffed did any officer ask for his name. Once restrained, he claims an officer grabbed him by his pinky fingers, bringing him to his knees. The same officer pushed him back to the ground, only to pick him up by his pinky fingers again. Another officer brought him to his feet by pulling on his biceps muscles. Additionally, officers squeezed the handcuffs, causing pain in his wrists. Samuelson asked, "What the hell is going on here? I am the one that called." At that time, an officer took Samuelson's wallet and examined his license.

After placing Samuelson in a police car, the officers searched the garage, but found no intruders or any sign of a break-in. The officers detected a strong solvent smell in the garage. Samuelson's explanation was earlier in the day, he varnished a table in the garage with a finish which had very little odor. While he was in the police car, he asked an officer why the wheels were turning on a stationary police car. Sergeant Losinksi decided to transport him to the New Ulm Medical Center based, in part, on his professional experience, Samuelson's demeanor, and the close proximity to the hospital.

Samuelson arrived at the hospital in a state of shock severe enough where he could not even hold a pencil. He was examined by Dr. Rysdahl, who observed the following: "His mind would all of a sudden not track. He would be saying one thing, and then he would forget. Another time he was talking about something and then all of a sudden he talked about if there's too many trees. He does not make any sense. It is like his mind is not tracking." Dr. Rysdahl signed the written application for a seventy-two-hour hold and stated Samuelson's fast heart rate and abnormal potassium and creatinine levels were most likely due to high stress levels.

Following this incident, Samuelson experienced severe pain in his shoulder and neck, causing him to take eight weeks off from his job as a logger. Although initial tests uncovered no "significant abnormalities," Samuelson continued to feel pain in his shoulder following ten weeks of physical therapy and he began another round of therapy. In June 2003, he still presented "with significant limitation of the right shoulder range of motion, clinical evidence of right subscapularis tendonitis and also involvement of other components of the rotator cuff." An orthopedic surgeon performed surgery on his rotator cuff in July 2003, but found no tear. As late as December 2003, Samuelson still complained of pain in the shoulder, requiring "ongoing exercising to fully rehabilitate and recondition the shoulder and arm." The same orthopedic surgeon stated "the medical evaluations, diagnostic studies, and treatment that [Samuelson] has undergone have all developed as a direct result of the alleged incident" because he had no preexisting arm or shoulder injuries.

II

We review the district court's grant of summary judgment and qualified immunity rulings de novo. Kuha v. City of Minnetonka, 365 F.3d 590, 596 (8th Cir. 2004). Summary judgment is appropriate if the record, when viewed in the light most favorable to the non-moving party shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In order to survive a motion for summary judgment under § 1983, the plaintiff must raise a genuine issue of material fact as to whether (1) the defendants acted under color of state law, and (2) the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." Kuha, 365 F.3d at 596 (internal quotation and citation omitted).

III

To determine whether the defendants are entitled to qualified immunity, we engage in a two-part analysis. Janis v. Biesheuvel, 428 F.3d 795, 799 (8th Cir. 2005). The first step is to determine whether, viewing the facts in the light most favorable to Samuelson, the officers' conduct violated a constitutional right. Id. (citing Andrews v. Fuoss, 417 F.3d 813, 816 (8th Cir. 2005)). If a constitutional right has been violated, we must then determine if such right was clearly established. Id. (citing Littrell v. Franklin, 388 F.3d 578, 582 (8th Cir. 2004)). This second step is a "fact-intensive inquiry and 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" Littrell, 388 F.3d at 583 (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).

A

Samuelson claims the officers violated his Fourth Amendment right to be free from excessive force. We analyze this claim under the Fourth Amendment reasonableness standard. Graham v. Connor, 490 U.S. 386, 396 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. (internal quotations and citations omitted). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. (citing Terry v. Ohio, 392 U.S. 1, 22-27 (1968)). To determine if the officers used excessive force, we pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (quoting Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)). Reasonableness is determined from the perspective of a "reasonable

officer on the scene, rather than with the 20/20 vision of hindsight." Id. (citation omitted). Additionally, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Id. at 396 (internal quotations and citations omitted). Furthermore, our inquiry is an objective one, "without regard to [the officers'] underlying intent or motivation." Id. at 397 (citations omitted).

The facts, viewed in the light most favorable to Samuelson, demonstrate he was compliant with the officers' requests and did not resist arrest. He kneeled on the ground and placed his hands on his head. During his conversation with Brennan, Samuelson made no sudden movements. Despite his compliance, Samuelson alleges an officer stood on top of him and punched him on the side of the head, ribs, side, and back of the neck with "hard blows" more than ten times. While being punched, Samuelson twice asked the officers what he had done, but an officer only responded: "You know what you did. And if you keep it up, you will really get a beating." Then other officers piled on top of Samuelson. One officer affixed handcuffs to Samuelson's left wrist and placed his foot on the side of Samuelson's head and applied pressure for five to ten seconds in order to release his other arm from under his body. The police also lifted Samuelson up to his knees by his pinky fingers on more than one occasion after he was in restraints, placing all of his weight on these two fingers, causing strain on his arms and shoulders.

Based on this evidence, we find a genuine issue of material fact exists concerning whether the amount of force used against Samuelson both in restraining him and after he was retrained was excessive. We also find a genuine issue of material fact exists concerning whether he resisted arrest. Further, we disagree with the district court's findings his injuries were de minimus. Crumley v. City of St. Paul, 324 F.3d 1003, 1007 (8th Cir. 2003) (holding "a de minimus level of force or injury is insufficient to support a finding of a constitutional violation"). Medical evidence in the record demonstrates Samuelson sustained injuries to his shoulder serious

-6-

enough to require surgery. These injuries arose "as a direct result of the alleged incident," i.e., the confrontation with the police; he had not suffered prior shoulder problems. Although he was not placed on work restrictions following his surgery, he continued to suffer pain in his shoulder in December 2003, almost a year after the incident. Thus, we reject the district court's contention these injuries are merely de minimus. See Wertish v. Krueger, 433 F.3d 1062, 1067 (8th Cir. 2006) (noting de minimus injuries include "minor scrapes and bruises and the less-than-permanent aggravation" of a prior injury); Foster v. Metro. Airports Comm'n, 914 F.2d 1076, 1082 (8th Cir. 1990) (holding "allegations of pain as a result of being handcuffed, without some evidence of more permanent injury," are insufficient to establish a Fourth Amendment violation).[1]

B

Defendants argue they are entitled to qualified immunity even if the force used in seizing Samuelson was unreasonable because his rights were not clearly established. See Littrell, 388 F.3d at 583 ("For a right to be deemed clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'") (citation omitted). "In other words, if the officers' mistake as to what conduct the law required is reasonable, they are entitled to the immunity defense." Kuha, 365 F.3d at 602 (citing Saucier, 533 U.S. at 205). "Defendants will not be immune, however, if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that the defendant should have taken the disputed action." Id. (internal quotations and citations omitted). Thus, qualified immunity operates to protect officers from the sometimes "'hazy border between excessive and acceptable force,'

_____

[1]Samuelson also contends the police acted unreasonably in detaining him at all. The defendants argue, and we agree, this is essentially an argument the police lacked probable cause to seize Samuelson. Under these circumstances, we find the police did have probable cause and conclude Samuelson's argument is without merit.

and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Id. (quoting Saucier, 533 U.S. at 206).

"[T]he right to be free from excessive force in the context of an arrest is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures." Henderson v. Munn, 439 F.3d 497, 503 (8th Cir. 2006). Under the facts of this case, we believe a genuine issue of material fact exists concerning whether the force used was "objectively reasonable in light of the facts and circumstances confronting" the officers. Kukla v. Hulm, 310 F.3d 1046, 1050 (8th Cir. 2002). The evidence, viewed in the light most favorable to Samuelson, shows the officers stepped on his head while handcuffing him. The evidence also shows he was beaten, hit, and kicked, although he was not resisting arrest, and the police picked him up by his pinky fingers after being restrained. Based on this evidence, we hold the district court erred in granting the defendants' motion for summary judgment on the basis of qualified immunity. See Thompson v. Zimmerman, 350 F.3d 734, 735 (8th Cir. 2003) (holding factual questions precluded summary judgment on qualified immunity grounds where an inmate alleged he was sitting quietly in his cell and did not resist when officers entered his cell and attacked him); Kukla, 310 F.3d at 1050 (holding the district court properly denied summary judgment on excessive force claim when plaintiff alleged during a traffic stop officer forced the plaintiff against a truck, twisted his arm and raised it high above his back, injuring his collar bone, shoulder, neck and wrist, although plaintiff did not resist); Lambert v. City of Dumas, 187 F.3d 931, 934, 936 (8th Cir. 1999) (finding summary judgment inappropriate on excessive force claim when the plaintiff claimed he was violently shoved and kicked into a police car even though he did not resist).

IV

Samuelson also contends the defendants violated his constitutional rights by transporting him to the hospital against his will where he was placed on seventy-

two-hour psychiatric hold.  Defendants argue they acted reasonably pursuant to the police officers' community caretaking function.

"[P]olice officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions.'" Winters v. Adams, 254 F.3d 758, 763 (8th Cir. 2001) (quoting United States v. King, 990 F.2d 1552, 1560 (10th Cir. 1993).  These functions include seizing a citizen "in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity."  Id.  However, there are limits to the community caretaking function. "Whether the seizure of a person by a police officer acting in his or her noninvestigatory capacity is reasonable depends on whether it is based on specific articulable facts and requires a reviewing court to balance the governmental interest in the police officer's exercise of his or her 'community caretaking function' and the individual's interest in being free from arbitrary government interference."  Id. at 767 (Bye, J., concurring) (quoting King, 990 F.2d at 1560).

We believe when the facts and reasonable inferences are viewed in Samuelson's favor, a jury could not find the officers' actions objectively unreasonable.  The transcript of his phone call to 911 demonstrates he was not speaking in a coherent manner.  The officers discovered his garage had a solvent smell, and he admitted to varnishing a table earlier in the day.  The officers also believed he was hallucinating because, although he reported there were individuals burglarizing his garage, the garage was secure and the officers uncovered no traces of a burglary.  Additionally, he asked an officer why the wheels were turning on a stationary police car.[2]  Based on

---

[2]The officers' beliefs are substantiated by the testimony of examining physician Dr. Rysdahl.  Dr. Rysdahl stated the following about Samuelson: "His mind would all of a sudden not track.  He would be saying one thing, and then he would forget. Another time he was talking about something and then all of a sudden he talked about if there's too many trees.  He does not make any sense.  It is like his mind is not tracking."

this evidence, we find no genuine issue of material fact as to whether the officers' actions in transporting him to the hospital to be screened for a seventy-two-hour hold were objectively unreasonable.

V

In an official immunity action, if the plaintiff has not raised any genuine issue of material fact tending to show the officers willfully or maliciously violated the plaintiff's rights, the officers are entitled to summary judgment. State by Beaulieu v. City of Mounds View, 518 N.W.2d 567, 571 (Minn. 1994). Malice is "the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right." Carnes v. St. Paul Union Stockyards Co., 205 N.W. 630, 631 (Minn. 1925).

Samuelson contends the officers are not entitled to official immunity on his state law claims because a rational trier of fact could conclude from the evidence the officers acted maliciously during his apprehension  For the same reasons discussed above, we agree this is a reasonable inference a jury could make from the facts as presented by Samuelson. See Craighead v. Lee, 399 F.3d 954, 963 (8th Cir. 2005).

VI

The order of the district court is affirmed in part and reversed in part. The case is remanded for further proceedings in accordance with this opinion.

_____

-10-