# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-3247

_____

United States of America

*Plaintiff - Appellee*

v.

Tyrone Harris

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: January 14, 2014
Filed: April 4, 2014

_____

Before RILEY, Chief Judge, WOLLMAN and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Tyrone Harris entered a conditional guilty plea to being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Harris now appeals the district court's[1] denial of his motions to suppress. On appeal, Harris contends that

---

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri, adopting the report and recommendation of the Honorable Sarah

the court should have suppressed evidence that the Kansas City Police Department obtained through its unlawful search and seizure of Harris. We disagree with Harris's contention, and we affirm the district court's denial of Harris's motions to suppress.

I.

Around 1:00 p.m. on January 29, 2011, a Greyhound bus employee called the Kansas City Police Department to notify the police that a man at its bus station had fallen asleep on a bench with a handgun falling out of his pants pocket. Firearms were prohibited in the Greyhound terminal as Greyhound had elected, pursuant to Mo. Rev. Stat § 571.107, to prohibit the carrying of concealed firearms at the bus station. See Report and Recommendation on Defendant's Motions to Suppress at 2. Three Kansas City Police Officers were immediately dispatched to the station. The bus station, on Troost Street in downtown Kansas City, is located in a high-crime area. Id. When the officers arrived at the station, the Greyhound employee who had called directed the officers toward the sleeping man. The man was lying on a bench, asleep, in the middle of the lobby waiting area. The man's legs were propped up on the bench and a handgun was "sliding" out of his right front pants pocket with the "handle and back portion of the slide" exposed. See Suppression Tr. at 15. Concerned that the man might wake up and attempt to use the handgun or that the handgun could fall out of the man's pants pocket and accidently discharge, one of the officers removed the handgun[2] from the sleeping man's pocket. See Report and Recommendation on Defendant's Motions to Suppress at 3-4. The officers woke the man and placed him in handcuffs. The officers then asked him his name, and ran his name through the police database. The man, who identified himself as Tyrone Harris, had an outstanding warrant for his arrest in Minnesota, so the officers arrested him.

---

W. Hays, United States Magistrate Judge for the Western District of Missouri.

[2]The gun was a loaded .380 caliber handgun with one round in the magazine. See Report and Recommendation at 3.

After Harris's motions to suppress the firearm were denied, Harris entered a conditional plea of guilty for being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g) and 924(e)(1), reserving his suppression arguments for appeal. Harris now appeals the district court's denial of his motions to suppress the firearm. Harris argues that the police officers violated his Fourth Amendment rights because they did not have probable cause to believe that he was committing a crime nor reasonable suspicion of criminal activity. Accordingly, the police officers had no right to remove the handgun from Harris's pocket and place him in handcuffs. The Government argues that the police had a reasonable suspicion that Harris was violating several of Missouri's gun laws and contends that, in any event, the police acted reasonably pursuant to the community caretaker doctrine.

We review the district court's denial of Harris's suppression motions de novo and the factual determinations underlying the district court's decision for clear error. See United States v. Orozco, 700 F.3d 1176, 1178 (8th Cir. 2012).[3] Applying this standard of review, we hold that the officers acted reasonably in their response to the emergency they faced, and accordingly, we affirm the district court's denial of Harris's motions to suppress.

## II.

The ultimate touchstone of the Fourth Amendment is "reasonableness." Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006). Generally, searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable, "'subject only to a few specifically established and well-delineated exceptions.'" United States v. Taylor, 636 F.3d 461, 464 (8th Cir. 2011) (quoting Mincey v. Arizona, 437 U.S. 385, 390 (1978)). The well-known

---

[3]We may affirm the district court's Fourth Amendment decision on any basis supported by the record. United States v. Goodwin-Bey, 584 F.3d 1117, 1121 (8th Cir. 2009).

exception upon which the Government initially relies, first recognized in Terry v. Ohio, permits an officer to stop and frisk an individual if the officer has a reasonable suspicion that "criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." See 392 U.S. 1, 30-31 (1968). The Government struggles to show, however, that the Kansas City police had a reasonable suspicion of criminal activity, the first requirement of a valid Terry stop. See United States v. Jones, 606 F.3d 964, 966-67 (8th Cir. 2010) (per curiam) (holding that the officers did not have a justification to stop the defendant merely because they suspected the defendant was carrying a firearm); United States v. Hughes, 517 F.3d 1013, 1019 (8th Cir. 2008).

Nevertheless, Terry remains relevant to the disposition of this case because the Terry Court recognized that "[e]ncounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime." Terry, 392 U.S. at 13. The Supreme Court has described this "community caretaking" aspect of local law enforcement as those activities that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Cady v. Dombrowski, 413 U.S. 433, 441 (1973). Our circuit has recognized, under the "community caretaker" classification, that noninvestigatory searches and seizures may be justified in certain limited situations. See Burke v. Sullivan, 677 F.3d 367, 371 (8th Cir. 2012); United States v. Quezada, 448 F.3d 1005, 1007 (8th Cir. 2006); Samuelson v. City of New Ulm, 455 F.3d 871, 877-78 (8th Cir. 2006); Winters v. Adams, 254 F.3d 758, 762-64 (8th Cir. 2001); accord Wilson v. State, 975 A.2d 877, 889-92 (Md. 2009) (compiling cases that have permitted noninvestigatory seizures under the community caretaker doctrine).

A search or seizure of a person by a police officer acting in the officer's noninvestigatory capacity is reasonable if the "governmental interest in the police officer's exercise of [the officer's] 'community caretaking function,'" "'based on

-4-

specific articulable facts,'" outweighs "'the individual's interest in being free from arbitrary government interference.'" Samuelson, 455 F.3d at 877 (quoting Winters, 254 F.3d at 767 (Bye, J., concurring)); accord United States v. Garner, 416 F.3d 1208, 1213 (10th Cir. 2005). The scope of the encounter must be carefully tailored to satisfy the purpose of the initial detention, and the police must allow the person to proceed once the officer has completed the officer's inquiry, unless, of course, the officer obtains further reason to justify the stop. See Garner, 416 F.3d at 1213; see also United States v. Morgan, 729 F.3d 1086, 1091 (8th Cir. 2013) ("While officers should employ the least intrusive means reasonably available to verify or dispel their suspicions, they may take any additional steps that are 'reasonably necessary to protect their personal safety . . . during the course of the stop.'" (alteration in original) (quoting United States v. Hensley, 469 U.S. 221, 235 (1985))).

One situation in which an officer may act under the community caretaker doctrine is when "the officer has a reasonable belief that an emergency exists requiring his or her attention." Burke, 677 F.3d at 371 (internal quotation marks omitted); see, e.g., Quezada, 448 F.3d at 1007 (holding that a warrantless entry into a home was reasonable because "a reasonable officer in the deputy's position could conclude that someone was inside but was unable to respond for some reason"); Winters, 254 F.3d at 764 (holding that a seizure without suspicion was reasonable because allowing a "possibly intoxicated individual to drive [a] vehicle" created a serious risk to the public). When police must make a split-second decision in the face of an emergency to either stand idly by, permitting a dangerous situation to continue uninterrupted, or act, addressing the potential danger to protect the public, we have reasoned that officers are expected to act. See, e.g., Samuelson, 455 F.3d 877-78; Winters, 254 F.3d at 764. With these legal standards in mind, we turn to the facts of this case.

We must first determine the capacity in which the officers were acting here because "there is a difference between the standards that apply when an officer [acts] as a so-called community caretaker and when he or she [acts] to investigate a crime." See Quezada, 448 F.3d at 1007. Viewing the circumstances and the officers' actions objectively, see Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080-83 (2011); Brigham City, 547 U.S. at 404-05, we are satisfied that the officers were acting in their community caretaker capacity. The police department received a request from Greyhound to assist it in dealing with a dangerous, potentially volatile situation. The circumstances in this case are analogous to those in Quezada and Winters, in which the officers were forced to respond to potential emergency situations while assisting members of the community. See Quezada, 448 F.3d at 1006-07 (holding community caretaker doctrine applied when officer encountered emergency while serving a child-protection order); Winters, 254 F.3d at 762-64 (holding community caretaker doctrine applied when officers responded to a complaint that an individual was acting irrationally at the end of a dead-end street in a residential area).

Next, we must weigh the government's interest in the officers' actions against Harris's right to be free from government intrusion. When the officers arrived at the public, highly trafficked Greyhound bus station, which is in a high-crime area, they saw a handgun hanging out of Harris's pocket. Any number of dangerous, or even deadly, outcomes[4] could have resulted if the officers had permitted the situation to continue uninterrupted. See United States v. Janis, 387 F.3d 682, 687-88 (8th Cir. 2004) (permitting officers to secure a weapon that had been used in an accidental

---

[4]For instance, a child or devious person could have taken the handgun out of Harris's pocket or the handgun could have fallen out of Harris's pocket, struck the floor, and discharged. In her report and recommendation, the Magistrate Judge found that the officer "removed the gun from the sleeping individual's pocket for officer safety and the safety of everybody in the building." Report and Recommendation on Defendant's Motions to Suppress at 3.

shooting); see also Florida v. J.L., 529 U.S. 266, 272 (2000) ("Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions."). The justification for the limited intrusion was not simply a suspicion that Harris was carrying a firearm, see, e.g., J.L., 529 U.S. at 270-73; Jones, 606 F.3d at 965-66, or even actual knowledge that Harris was carrying a firearm; the justification was that the police knew that Harris was carelessly handling a firearm in a dangerous and public location that had forbidden firearms. Unlike most typical Fourth Amendment encounters, the governmental interest vindicating the officers' actions here is not encompassed in the enforcement of criminal statutes but, instead, in the officers' obligation "to help those in danger and to protect property," see Quezada, 448 F.3d at 1007, and to "'ensure the safety of the public and/or the individual, regardless of any suspected criminal activity.'" See Samuelson, 455 F.3d at 877 (quoting Winters, 254 F.3d at 763)); cf. Terry v. Ohio, 392 U.S. 1, 13 & n.9 (1968) (reasoning that a police encounter may "be designed simply to help an intoxicated person find his way home, with no intention of arresting him unless he becomes obstreperous"). In light of the risks Harris's exposed and unguarded firearm posed, the officers were permitted, and likely expected, to remove the firearm from Harris's pocket. See United States v. Collins, 321 F.3d 691, 694-95 (8th Cir. 2003) (holding that the police were justified to conduct a brief search of a car after shots were fired in the area because not doing so "would have been irresponsible and, quite possibly, a basis for civil liability had the individuals . . . been injured").

Once we are satisfied that the initial encounter was justified, we must assess whether the scope of the encounter was carefully tailored to satisfy the purpose of the initial detention. Here, we consider the protective measures the police took to ensure their safety and the scope and duration of the intrusion.

In the course of an encounter, police officers may take steps reasonably necessary to protect their personal safety. United States v. Morgan, 729 F.3d 1086,

1091 (8th Cir. 2013). During a Terry stop, we have reasoned that officers may "handcuff a suspect . . . to protect their personal safety" and maintain the status quo. Id.; United States v. Smith, 645 F.3d 998, 1002 (8th Cir. 2011). Officers may take similar protective measures during consensual encounters. See United States v. Davis, 202 F.3d 1060, 1063 (8th Cir. 2000). The officers' encounter with Harris is no different than a Terry stop or consensual encounter in the sense that it involved police action "'at close range,'" see Morgan, 729 F.3d at 1091 (quoting Terry, 392 U.S. at 24), and, as such, the officers were entitled to take reasonable protective measures. See Davis, 202 F.3d at 1062-63. The officers' decision to handcuff Harris was reasonable considering the "circumstances confronting the officer when he made the decision." See id. at 1063. The officers knew that they were in a high-crime area, Harris was carrying at least one weapon, and Harris was sleeping. Faced with these circumstances, the officers' decision to handcuff Harris until they could safely awaken him and obtain more information was reasonable. See United States v. Martinez, 462 F.3d 903, 907-08 (8th Cir. 2006).

Finally, the scope and duration of the intrusion were also reasonable. After the officers woke Harris, they asked Harris his name and were notified that he had an outstanding warrant for his arrest. The officers were entitled to verify Harris's identity because his identity was reasonably related to the circumstances justifying the encounter. See United States v. Garcia, 646 F.3d 1061, 1069 (8th Cir. 2011); cf. Illinois v. Wardlow, 528 U.S. 119, 125 (2000) (reasoning that an innocent explanation may exist for an ambiguous situation but officers can detain an individual in order to "resolve the ambiguity"). The officers' justification to intervene arose because of the evident risk the unguarded handgun posed to the public. By returning the handgun to an individual "'wanted for another offense, or [with] a record of violence or mental disorder'" without further inquiry, the officers would have instantly revived a dangerous situation. See Garcia, 646 F.3d at 1069 (quoting Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 186 (2004)). Verifying Harris's identity

was a quick and minimally intrusive method for the officers to protect themselves and those around them. Once the officers learned of the outstanding warrant for Harris's arrest, the officers had probable cause for the arrest. See Johnson v. Phillips, 664 F.3d 232, 237-38 (8th Cir. 2011) ("The outstanding warrant gave [the officer] probable cause to arrest [the individual].").

Our inquiry in this case is guided by the Fourth Amendment's central requirement, reasonableness. Based on the specific and unusual facts of this case, we hold that the officers' response to this situation was reasonable.

III.

For the foregoing reasons, we affirm the district court's denial of Harris's motion to suppress.

_____