# IN THE COURT OF APPEALS OF IOWA

No. 18-1590
Filed March 4, 2020

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**DAVID M. PUTZ,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Jasper County, Terry Rickers, Judge.


        A defendant appeals his convictions for sponsoring a gathering where controlled substances were used and possession with intent to deliver marijuana. **REVERSED AND REMANDED.**


        Martha J. Lucey, State Appellate Defender, and Kerrigan Owens (until withdrawal), law student, for appellant.

        Thomas J. Miller, Attorney General, and Timothy M. Hau, Assistant Attorney General, for appellee.


        Heard by Bower, C.J., and Tabor, Mullins, May, and Greer, JJ.

**TABOR, Judge.**

Today we must decide if a police officer may enter a third party's residence without a search warrant based on a verbal request from the Iowa Department of Human Services (DHS) to take custody of a juvenile. The officer's warrantless entry into the residence of David Putz and Carrie Carre to locate fourteen-year-old D.B. led to a search for drugs and charges against the couple. The district court denied Putz's motion to suppress and convicted him on a stipulated record. In this appeal, Putz contests his drug convictions by arguing the officer's entry violated his constitutional rights. Because the State failed to show a recognized exception to the warrant requirement justified that entry, we reverse the suppression ruling and remand for further proceedings consistent with this opinion.[1] We reach the same conclusion in *State v. Carre*, No. 18-1584, 2020 WL _____, at *___ (Iowa Ct. App. Mar. 4, 2020), also filed today.

## I. Facts and Prior Proceedings

We glean the following facts from the suppression hearing and the minutes of testimony. After Putz waived his right to a jury trial, the district court relied on those stipulated minutes to find him guilty of possession of marijuana with intent to deliver and sponsoring a gathering where controlled substances were used.

This case did not start as a drug investigation. It started over concerns for the welfare of a juvenile. Those concerns reached Newton Police Officer Andrew Hansen on December 12, 2016, when he fielded a call from D.B.'s sister.[2]

---

[1] Because we reverse on this ground, we need not address Putz's other issues.
[2] Our record does not contain any information about the sister's age, her location, or any context for her concerns. Nor does it contain any information about D.B.'s mother other than she was located in Davenport.

According to Officer Hansen's testimony at the suppression hearing, the sister said D.B.'s mom "was not around. She was in Davenport. [D.B.] was on his own. He was drinking alcohol and going with older males to Sioux City." Rather than starting an investigation, Officer Hansen advised D.B.'s sister to call the DHS.

Two days later, the officer received a call from Jared Lawrence, a DHS child protection worker based in Mahaska County. Lawrence said "he wanted a law enforcement emergency removal done on [D.B.]." Lawrence believed the officer could find D.B. at a Newton residence. Lawrence's information came from Carre, who notified the DHS that D.B. was at her home. She reportedly told Lawrence D.B. was "skittish" and "she was doing the best she could to keep him at the residence." Lawrence was prepared to testify that on December 12 he spoke with D.B.'s sister; from that conversation Lawrence understood "[D.B.]'s whereabouts were unknown" and he "had been transient for the past several months." The next day, Lawrence called the Newton School District to see if D.B. was enrolled (he was not). And after receiving Carre's call on December 14, Lawrence contacted Newton police to request a "law enforcement removal" of D.B.

When asked what a "law enforcement removal" entailed, Officer Hansen said: "There's a situation where a child is in danger. DHS would like [law enforcement] to pick them up right away, and then DHS will find placement for them in a safe environment." The officer did not believe he needed a court order for the "emergency law enforcement removal" sought by the DHS. Officer Hansen said Lawrence had spoken with the county attorney's office and "they would fill out the paperwork the next day."

On the same evening he spoke with Lawrence, Officer Hansen went to find D.B. at the house where Carre and Putz lived. The officer knocked at the front door. He testified "a male between fifteen and eighteen years of age" answered the door.[3] The officer testified he did not know it then, but later learned the person who answered the door was D.B.'s eighteen-year-old brother. Officer Hansen recalled asking if D.B. was there. But the occupant walked away without answering. The officer testified: "I advised him I would need to follow him in." The officer acknowledged he did not have consent to enter the house. Rather, the officer reasoned: "I read the body language of the individual I was speaking with, and I knew something was not right. And he just walked away from me so I went to investigate what was going on." When asked to elaborate, the Officer Hansen explained, "I was not—I did not feel I needed to run after him. But the situation was odd, and his lack of emotion and lack of acknowledgement was concerning to me so I followed him in."

The officer followed the teenager to the back of the home where a younger male emerged from a bedroom. That younger teenager identified himself as D.B. Officer Hansen told D.B. that he "would need to come with me."

But taking D.B. into custody did not end the officer's involvement. When the bedroom door opened, the officer smelled "the burnt odor of marijuana." Then Carre walked out of that bedroom. When the officer asked about the smell, Carre said D.B. "smoked a bowl to calm down." Based on that admission, Officer Hansen

---

[3] A witness for the defense contradicted the officer's version of events. A.C., Carre's daughter, testified she answered the door that evening and "was surprised to see a cop standing there."

asked for consent to search. Carre declined, telling the officer that he "would need a search warrant."

So Officer Hansen sought a search warrant for the entire house. While waiting for the warrant, the officer gathered all the occupants into the living room. Those occupants included Carre, Carre's two daughters, Putz, D.B., DB.'s brother, and another teenager. Officer Hansen also "did a quick visual search" to "make sure there was nobody else in the residence. During that sweep, he noticed a marijuana pipe in another bedroom. Also before obtaining the warrant, the officer searched toiletry bags that Carre retrieved from the bedroom. The bags contained methamphetamine.

The warranted search of the residence revealed additional drug paraphernalia, a glass jar containing eighteen baggies of marijuana, as well as a safe holding two more glass jars containing five and six baggies of a green, leafy substance, a digital scale, and additional plastic bags. Putz told officers the marijuana belonged to him and was for his personal use.

The State charged Putz with delivery or possession with intent to deliver methamphetamine, sponsoring a gathering where controlled substances were used, and delivery or possession with intent to deliver marijuana. He moved to suppress the evidence found at his residence. He claimed the officer's warrantless entry into his home violated his rights under both the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution.

After the district court denied that motion, the State amended its trial information to add two counts of distributing controlled substances to minors. Putz waived his right to a jury trial, and the State proceeded with a trial on the minutes

of testimony for (1) possession with intent to deliver marijuana in violation of Iowa Code section 124.401(1)(B)(7) (2016) and (2) sponsoring a gathering where controlled substances were used in violation of section 124.407. The district court found Putz guilty on those two counts. He now appeals.

## II. Scope and Standard of Review

We review de novo this challenge to the suppression ruling because Putz's appeal implicates constitutional issues. *See State v. Baker*, 925 N.W.2d 602, 609 (Iowa 2019). We independently evaluate the totality of the circumstances as shown by the entire record. *Id.* We defer to the district court's factual findings, but they do not bind us. *Id.*

## III. Analysis

Both the Fourth Amendment and article I, section 8 protect against unreasonable searches and seizures.[4] Our supreme court has recognized the preference for search warrants. *See State v. Angel*, 893 N.W.2d 904, 911 (Iowa 2017). That preference is especially strong when defendants challenge a search of their home under the state constitution. *See State v. Short*, 851 N.W.2d 474, 502 (Iowa 2014) (expressing "little interest in allowing the reasonableness clause to be a generalized trump card to override the warrant clause in the context of home searches").

Putz contends Officer Hansen's warrantless entry into his home violated his constitutional rights. We address that contention in a two-step analysis: (1) did

---

[4] On appeal, Putz does not urge a different standard for interpreting the state constitutional provision but contends the Iowa Supreme Court may apply the standard more stringently under state than federal case law. *See State v. Ochoa*, 792 N.W.2d 260, 267 (Iowa 2010).

Putz have a reasonable expectation of privacy in the area searched and (2) if so, did the State unreasonably invade that protected interest? *See State v. Tyler*, 867 N.W.2d 136, 167 (Iowa 2015). Here, no dispute arises that Putz had a reasonable expectation of privacy in the home he shared with Carre. In fact, the "chief evil" the Fourth Amendment and article I, section 8 each strive to address is such a warrantless intrusion into a home. *State v. Kern*, 831 N.W.2d 149, 164 (Iowa 2013). So we turn to the reasonableness of the invasion of that protected interest.

"Subject to a few carefully drawn exceptions, warrantless searches and seizures are per se unreasonable." *State v. Lewis*, 675 N.W.2d 516, 522 (Iowa 2004). Courts recognize exceptions to the warrant requirement for searches based on consent, plain view, probable cause coupled with exigent circumstances, searches incident to arrest, and emergency aid. *Id.* The State bears the burden to prove an exception applies. *State v. Watts*, 801 N.W.2d 845, 850 (Iowa 2011).

In the district court, the State argued three exceptions to the warrant requirement: consent, emergency aid, and probable cause (or its equivalent) plus exigent circumstances. The district court rejected the first two exceptions. First, the State did not show Officer Hansen received permission to enter the home: "The Court does not find that opening a door to a police officer operates as consent for the officer to enter the home." Second, the court ruled the emergency-aid exception did not apply because the State did not show the risk of imminent danger:

> Even though Officer Hansen had been dispatched to perform the emergency removal of a minor, the State has failed to show that it was reasonable for Officer Hansen to believe that an emergency existed. At the time he knocked on the front door, he did not know if

[D.B.] was still present in the home, or have any knowledge that showed [D.B.] was at risk for death or bodily injury.

So the State was left with the warrant exception for probable cause (or its equivalent) coupled with exigent circumstances. The district court latched onto that rationale, recognizing "the State's strong interest in safely recovering [D.B.]" as a runaway under Iowa Code section 232.19(1)(c) and finding "exigent circumstances necessary" to enter Putz's residence without a warrant based on Carre's description of the juvenile as "skittish."

On appeal, the State does not resurrect the consent exception but does reprise its community-caretaking argument rejected by the district court, as well as advocating that entry into Putz's home was supported by the equivalent of probable cause coupled with exigent circumstances. We will address each of those exceptions in turn.

## A. Community Caretaking/Emergency Aid

The United States Supreme Court recognized the community-caretaking exception to the warrant requirement in *Cady v. Dombrowski*, holding: "Local police officers . . . engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." 413 U.S. 433, 441 (1973). Community-caretaking has three subdivisions: "(1) the emergency aid doctrine, (2) the automobile impoundment/inventory doctrine, and (3) the 'public servant' exception." *Tyler*, 867 N.W.2d at 170. The emergency-aid and public-servant doctrines are "analytically similar"—though critics brand the public-servant category as "amorphous" and at risk of "swallowing up constitutional

restrictions on warrantless searches all together." *See State v. Coffman*, 914 N.W.2d 240, 245 (Iowa 2018); *id.* at 263 (Appel, J., dissenting).

In this appeal, the State focuses on the emergency-aid exception, contending "the information available to Hansen would have led a reasonable person to believe emergency action was necessary." It is true, a police officer may enter a home without a warrant to render emergency assistance. *See State v. Emerson*, 375 N.W.2d 256, 258–59 (Iowa 1985). But the admissibility of evidence discovered after that entry hinges on this question—would a reasonable person have believed an emergency existed? *State v. Carlson*, 548 N.W.2d 138, 141 (Iowa 1996); *see also Coffman,* 914 N.W.2d at 257–58 (holding under Iowa Constitution, the State must also show officer "subjectively intend[ed] to engage in community caretaking"). Framed more broadly, we must ask (1) was Officer Hansen conducting bona fide community-caretaking activity and (2) did the public's need for that activity outweigh the intrusion on Putz's privacy interest in his home. *See Coffman*, 914 N.W.2d at 244–45.

The district court found insufficient proof the officer's warrantless entry was necessary to rescue or render aid to D.B. After all, Officer Hansen did not know if D.B. was actually at the home when he knocked on the door. Neither did Officer Hansen know if the young man who answered the door was D.B. or was about to alert D.B. to the police presence. In fact, he described the person who answered

the door as somewhat older than D.B.—fifteen to eighteen years old, rather than D.B.'s fourteen years.[5]

To counter the district court's finding, the State cites *Carlson*, where the police entered the defendant's home, looking for his girlfriend who was reported missing by her distraught daughters. 548 N.W.2d at 142. That missing woman was trying to end an abusive relationship with Carlson and, uncharacteristically, did not answer calls from her daughters for two days. *Id.* at 143. Carlson did not answer the officer's knock at the door, but tire tracks in the snow confirmed he was at home. *Id.* (accepting reasonable belief that "it seemed highly likely that some terrible harm had befallen her, requiring a rescue").[6]

The State compares the missing-person report in *Carlson* to the DHS concerns for D.B. The State's comparison is apt on the surface. But digging deeper, the cases bear few similarities. Here, the State offered no evidence D.B. faced any harm *inside* the Putz-Carre residence. In fact, Carre herself had contacted the DHS to let child protection workers know D.B. was safe at their home. At oral argument, the State pointed only to the risk of D.B. taking flight from Putz's home, possibly out a back door.

---

[5] Hansen testified he was the only officer at the scene and "did not want that individual running out the back door." The officer testified while he was not familiar with the Putz residence, it was a "bungalow type house" likely with a "similar layout" to other houses of that style that featured a back door. Despite his familiarity with the bungalow layout—and Carre's warning that D.B. was "skittish"—Officer Hansen did not take the reasonable step of bringing a second officer to the call in case D.B. tried to slip out the back.

[6] The State also cites *State v. York*, No. 12-0405, 2013 WL 530956, at *5 (Iowa Ct. App. Feb. 12, 2013), in which we approved reliance on the emergency-aid exception when "[a]n intoxicated and suicidal teenager led police to a home where they discovered signs of a forced entry and unresponsive residents." Unlike D.B.'s situation, the facts in that case justified the officers "in fearing for the juvenile's life."

"The emergency-aid exception is subject to strict limitations." *Id.* at 141. This case does not fall within those narrow constructs. We agree Officer Hansen arrived at the Putz-Carre residence to conduct bona fide caretaking activity— acting on the DHS request to find a teenager whose sister expressed concerns about his welfare. And we appreciate that peace officers must often react to changing circumstances with little time for introspection. *See U.S. v. Harris*, 747 F.3d 1013, 1017–18 (8th Cir. 2014) (recognizing police may be called to "make a split-second decision in the face of an emergency" to protect the public).

But after Officer Hansen knocked on the front door and asked if D.B. was there, the officer switched to investigation mode. He testified the young man's "lack of acknowledgement was concerning to me so I followed him in." The officer's decision to "investigate what was going on" arose from his mere hunch that something was "not right" about the situation. The officer's "read" of that young man's "body language" did not provide a reasonable basis to believe D.B. was present, still less that D.B. faced serious harm inside that home requiring the officer's warrantless entry to render immediate aid. *See Kern*, 831 N.W.2d at 174 (holding community-caretaking exception did not justify police entry into home where officer's motivation was to search for evidence of a crime).

The lack of imminent danger was also evident from the fact that two days earlier Officer Hansen learned of the sister's concerns but did not take any action to find fourteen-year-old D.B. Instead, the officer recommended the sister contact DHS workers to "advise them of the situation." Nothing about the circumstances the officer encountered at Putz's residence corroborated the corrupting influence of "older males" D.B.'s sister mentioned. The State offered no proof that D.B.'s

"transient" situation had reached an emergency status that justified police in making a warrantless entry into a third party's home.

Like the district court, we reject the State's reliance on the emergency-aid exception.

### B. Taking Custody of a Runaway Under Exigent Circumstances

That rejection leaves us with the State's remaining argument—that Officer Hansen's entry into Putz's home fell under the warrant exception for probable cause coupled with exigent circumstances. The State does not argue Officer Hansen had probable cause to believe a crime was being committed in Putz's home. Instead, the State argues—and the district court accepted—that the officer had "the equivalent" of probable cause under the child-welfare chapter.

Generally, probable cause exists to conduct a search if a reasonably prudent person would believe evidence of a crime might be located at that place. *See State v. Nitcher*, 720 N.W.2d 547, 554 (Iowa 2006). Exigent circumstances generally involve the danger of violence or injury to police officers or others, the risk of the subject's escape, or the probability that evidence will be concealed or destroyed if the officer waits for a warrant to act. *Id.* at 555. To decide if an officer faced an exigency that justified acting without a warrant, we look to the totality of circumstances. *See Missouri v. McNeely*, 569 U.S. 141, 149 (2013).

Although the district court did not believe the State offered sufficient evidence of an emergency for the emergency-aid exception, it nevertheless decided the DHS request that police execute an "emergency removal of a minor" was the "equivalent" of probable cause. As for exigent circumstances, the district court identified Officer Hansen's reliance on "Carre's own expression of urgency"

when describing D.B.'s restlessness and her attempts to keep the teenager at the house.

We start with the probable-cause equivalency. The district court noted this case was "factually unique" because it did not involve a crime but rather "the emergency removal of a minor without any type of court or administrative order." The court then cited two provisions—Iowa Code sections 232.19 and 232.79—as "scenarios where a police officer may take a minor into custody." The court decided "the most applicable scenario" was the authorization to seize runaway children. That code section provides:

> A child may be taken into custody . . . [b]y a peace officer, when the peace officer has reasonable grounds[7] to believe the child has run away from the child's parents, guardian, or custodian, for the purposes of determining whether the child shall be reunited with the child's parents, guardian, or custodian, placed in shelter care, or, if the child is a chronic runaway and the county has an approved county runaway treatment plan, placed in a runaway assessment center under section 232.196.

Iowa Code § 232.19(1)(c).

The district court assumed D.B. had "run away" from his parents because the sister reported his mother was in Davenport and he was in Newton.[8] Putz attacks that assumption on appeal. He points out the legislature did not define "runaway" in chapter 232 but did so in the criminal code. The kidnapping chapter defines "a runaway child" as "a person under eighteen years of age who is

---

[7] The State asserts, and we agree, that the standard of "reasonable grounds" is comparable to the "probable cause" requirement. *See Kraft v. City of Bettendorf*, 359 N.W.2d 466, 469 (Iowa 1984) (equating expression "reasonable ground" in arrest statute to traditional "probable cause").

[8] Carre's daughter, A.C., testified D.B.'s sister had talked to their family "about how [D.B.] hadn't been home much and he'd been running away and he'd just been in some trouble and so we were trying to help him out."

voluntarily absent from the person's home without the consent of the person's parent, guardian, or custodian." *Id.* § 710.8(1)(c). Putz contends the State failed to prove Officer Hansen had reasonable grounds to believe D.B. was a runaway. Putz asserts the record does not show "where D.B.'s home was located, the identity of D.B.'s primary parent, guardian or custodian, who D.B. lived with, or whether on December 14, 2016 D.B. was a runaway."

We agree the State did not establish that the officer had information to show D.B. was voluntarily absent from his home without parental consent. Nothing in this record shows that between the sister's calls on December 12 and the officer's warrantless entry on December 14, either the DHS or the police tried to contact D.B.'s mother to check on his status. The State presented no evidence to clarify where D.B. was living; the hearsay relayed from his sister did not make clear whether D.B. left the mother's new home in Davenport or if the mother moved there without him. The record did show D.B.'s older brother was with him in Newton. The State cannot rely on the runaway-child provision in section 232.19(1)(c) as the equivalence of probable cause that a crime had been committed without proof the officer reasonably believed D.B. had run away from his parents.

In the district court, the State also relied on section 232.79(1). That statute allows a peace officer to take a child into custody without a court order or parental consent if "the child is in a circumstance or condition that presents an imminent danger to the child's life or health" and "[t]here is not enough time to apply for an

order under section 232.78."[9]  Hansen's testimony at the suppression hearing points to section 232.79 as the basis for his trip to Putz's residence.  The officer cast the DHS request as an "emergency removal" where "a child is in danger."

But as Putz argues on appeal, the State did not establish D.B. was in "a circumstance or condition" that presented "imminent danger" to his life or health. *Id.* § 232.79(1)(a).  Nor did the State show it did not have enough time to apply for an ex parte order from the juvenile court.  *See id.* § 232.78.  On appeal, the State responds it was "immaterial" whether it had time to seek court approval for the removal because the officer was acting as a community caretaker.  The State also admits if D.B. was a runaway, it could not have satisfied the requirements under section 232.78(1) because the record lacks evidence of D.B.'s parents' consent or conduct.  We are unconvinced by the State's circular argument.  Because we have already rejected the State's community-caretaker theory, we cannot conclude section 232.79 provided the officer authority to enter the Putz residence to remove D.B.

Returning to the State's theory that D.B. was a runaway, even if Officer Hansen had reasonable grounds to believe that was true, section 232.19(1)(c) only authorized the officer to apprehend the child.  *See State v. Ahern*, 227 N.W.2d 164, 167 (Iowa 1975) (holding code section "allows a peace officer to take into

---

[9] The juvenile court may enter an ex parte order for the temporary removal of a child when (1) a parent or guardian is (a) absent, (b) refuses to consent to the child's removal, or (c) there is reasonable cause to believe that a request for consent to remove the child will further endanger the child or cause the parent or guardian to take flight *and* (2) where it appears that the child's immediate removal is necessary to avoid imminent danger to the child's life or health *and* (3) there is not enough time to file a petition and hold a hearing under section 232.95.  *See* Iowa Code § 232.78(1).

immediate custody a runaway child"). It did not separately permit the officer to cross the threshold into a third party's home to take the juvenile into custody. As the *Ahern* court cautioned: "Of course, that section may not authorize deprivation of fourth amendment protections." *Id.*

Even if the State could rely on the runaway-child provision as the equivalent of probable cause, we cannot find exigent circumstances paved the officer's entry into Putz's home. The State must advance "specific, articulable grounds" to support a finding of exigent circumstances. *Watts*, 801 N.W.2d at 851. In the context of entering a home without a warrant to make an arrest, a finding of exigency requires courts to consider these important, but not all-inclusive criteria:

> (1) a grave offense is involved;
> (2) the suspect is reasonably believed to be armed;
> (3) there is probable cause to believe the suspect committed the crime;
> (4) there is strong reason to believe he is on the premises;
> (5) there is a strong likelihood of escape if not apprehended; and
> (6) the entry, though not consented to, is peaceable.

*State v. Luloff,* 325 N.W.2d 103, 105 (Iowa 1982).

Here, the State contends "any parent would agree a runaway juvenile is a situation necessitating immediate police action."[10] That contention rings true in the abstract. But here any concrete information from the perspective of D.B.'s parents

---

[10] The State cites two out-of-state cases upholding officers' warrantless entry into defendants' home to find runaway juveniles. *See State v. Smith,* 367 P.3d 260 (Idaho Ct. App. 2016); *State v. Sadler,* 193 P.3d 1108 (Wash. Ct. App. 2008), declined to follow on other grounds in *State v. Sublett,* 292 P.3d 715 (Wash. 2012). In both cases, the police had strong evidence the juveniles were being held on the property of suspects who threatened the juveniles with serious harm. *Smith*, 367 P.3d at 263–64; *Sadler*, 193 P.3d at 1121. By contrast, Officer Hansen had no information Carre or Putz posed any danger to D.B.'s safety. In fact, he knew Carre had called the DHS to report D.B.'s location.

is glaringly absent. The officer had no basis to believe D.B.'s alleged presence at the Putz home required immediate police action.

When viewed in its totality, the record here does not support the district court's finding of exigent circumstances. The district court focused on Carre's description of D.B. as "skittish" to presume he was a "flight risk." But as the district court recognized, Officer Hansen did not know if D.B. was still present in the home when he entered the front door. And the officer had no information that D.B. faced imminent danger if he was still inside the home or, conversely, that he faced imminent danger if he left the home. Here, a sister expressed concern her teenaged brother was "on his own" and making bad choices. The officer originally diverted her concerns to DHS.

DHS learned from Carre that D.B. was present in her home and that she would try to keep him there. Dispatched to that house, the officer knocked on the door. When an occupant, who appeared to be in his teens answered, the officer did not ask for Carre so that she could confirm D.B.'s presence in her home. Instead, based on that teenager's body language, the officer felt compelled to walk into the house without consent. That situation did not amount to exigent circumstances.

Both the Fourth Amendment and article I, section 8 draw a "firm line at the entrance to the house." *See Watts*, 801 N.W.2d at 852 (quoting *Payton v. New York*, 445 U.S. 573, 590 (1980)). Without exigent circumstances, an officer may not cross that threshold without a warrant. *Id.* Here, the State failed to show specific, articulable grounds to support a finding of exigent circumstances to justify Officer Hansen's entry.

Because the State did not establish an exception to the warrant requirement justifying the officer's entry, all evidence discovered in Putz's home must be suppressed. *See Luloff*, 325 N.W.2d at 106 ("Information gained during the illegal entry led to the discovery of evidence that formed the basis for the search warrant. The exclusionary rule bars the use of both evidence directly seized in an illegal search and evidence discovered indirectly through the use of evidence or information gained in the illegal search."). We reverse the suppression ruling and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

Bower, C.J., and Mullins, J., concur; May, J., concurs specially; and Greer, J., partially dissents.

**MAY, Judge** (specially concurring).

I specially concur for the reasons explained in *State v. Carre*, No. 18-1584, 2020 WL _____ (Iowa Ct. App. Mar. 4, 2020), also filed today.

**GREER, Judge** (concurring in part and dissenting in part).

For the reasons explained in my partial dissent in *State v. Carre*, No. 18-1564, 2020 WL ____ (Iowa Ct. App. Mar. 4, 2020), also filed today, I respectfully dissent from the majority's conclusion that the community-caretaking doctrine does not apply here. I would find the officer's warrantless entry into the home falls under the community-caretaking exception to the warrant requirement and would affirm the district court on that issue.